# BROTHERHOOD OF LOCOMOTIVE ENGINEERS ET AL. *v.* BALTIMORE & OHIO RAILROAD CO. ET AL.

No. 730.    Decided March 4, 1963.

*Harry Wilmarth, Edward B. Henslee, Jr., Ruth Wey-
and, Milton Kramer, Lester P. Schoene, Harold N.
McLaughlin* and *Harold C. Heiss* for petitioners.

*Hermon M. Wells* for respondents.

Per Curiam.

Certiorari is granted and the judgment of the Court
of Appeals is affirmed for the reasons stated in this
opinion.

The petitioners, hereinafter referred to as the Organi-
zations, are the Brotherhood of Locomotive Engineers,
Brotherhood of Locomotive Firemen and Enginemen,
Order of Railway Conductors and Brakemen, Brotherhood
of Railroad Trainmen, and Switchmen's Union of North
America. The respondents, hereinafter referred to as the
Carriers, are the Baltimore & Ohio Railroad Company and
15 other named railroad companies, as representatives of
a class of more than 200 such companies.

In February of 1959, the Association of American Rail-
roads proposed the creation of a presidential commission
to investigate and report on the possibility of a radical
overhaul of working rules affecting the Organizations and
their members in the light of substantial technological
changes in the railroad industry. The basis for this pro-
posal was that ". . . drawing up sound new work stand-
ards for the railroad industry has become so complex and
challenging that the machinery provided for settling
ordinary disputes appears hopelessly inadequate to
cope with this task." The Organizations opposed this
proposal, and the President of the United States, in
September of 1959, refused to appoint such a commission.

On November 2 of that year, pursuant to § 6 of the Railway Labor Act,[1] the Carriers served on the Organizations notices of intended changes in agreements affecting rates of pay, rules, and working conditions. After conferences both on individual railroads and on a national level had failed to produce agreement concerning the proposed changes, the Organizations and the Carriers in October of 1960, under the auspices of the Secretary of Labor, agreed to the creation of a Presidential Railroad Commission which was to investigate and report on the controversy, and was also authorized "to use its best efforts, by mediation, to bring about an amicable settlement . . . ." [2] The parties agreed that the proceedings

---

[1] Section 6 of the Railway Labor Act, as amended, 45 U. S. C. § 156, provides:

"Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

[2] This authorization echoed the words of § 5 First of the Railway Labor Act, as amended, 45 U. S. C. § 155 First:

"First. The parties, or either party, to a dispute between an employee or group of employees and a carrier may invoke the services of the Mediation Board in any of the following cases:

"(a) A dispute concerning changes in rates of pay, rules, or working conditions not adjusted by the parties in conference.

of the Commission were to be accepted ". . . as in lieu of the mediation and emergency board procedures provided by Section[s] 5 and 10 of the Railway Labor Act." The Commission was created by Executive Order 10891 in November of 1960, and its members were appointed in December of that year.

The report and recommendations of the Commission were delivered to the President on February 28, 1962, and national conferences on the issues which remained in dispute resumed on April 2 and continued through May 17. No agreement having been reached, the Organizations on May 21 made application for the mediation services of the National Mediation Board pursuant to § 5 of the Railway Labor Act.[3] Between May 25 and June 22, approximately 32 meetings were held by the Organiza-

---

"(b) Any other dispute not referable to the National Railroad Adjustment Board and not adjusted in conference between the parties or where conferences are refused.

"The Mediation Board may proffer its services in case any labor emergency is found by it to exist at any time.

"In either event the said Board shall promptly put itself in communication with the parties to such controversy, and shall use its best efforts, by mediation, to bring them to agreement. If such efforts to bring about an amicable settlement through mediation shall be unsuccessful, the said Board shall at once endeavor as its final required action (except as provided in paragraph third of this section and in section 160 of this title) to induce the parties to submit their controversy to arbitration, in accordance with the provisions of this chapter.

"If arbitration at the request of the Board shall be refused by one or both parties, the Board shall at once notify both parties in writing that its mediatory efforts have failed and for thirty days thereafter, unless in the intervening period the parties agree to arbitration, or an emergency board shall be created under section 160 of this title, no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose."

[3] See note 2, *supra*.

tions and the Carriers under the auspices of the Chairman of that Board, but no agreement was reached. The Organizations having refused to submit the dispute to arbitration, the National Mediation Board on July 16 terminated its services under the provisions of the Railway Labor Act.

On the following day, the Carriers served notice on the Organizations that, as of August 16, 1962, changes in rules, rates of pay, and working conditions would be placed in effect by the Carriers. On July 26, the Organizations brought the present suit seeking a judgment that the proposed rule changes would violate the Railway Labor Act. Subsequently, the Carriers, with leave of court and without objection from the Organizations, withdrew their July 17, 1962, notices, and substituted therefor the notices which had been served on November 2, 1959, to become effective August 16, 1962. The Organizations' complaint was then amended to seek similar relief against those notices.

The District Court found that both parties had exhausted all of the procedures available under the Railway Labor Act, and that they were therefore free to resort to self-help, restricted only by the possibility of the appointment of an Emergency Board by the President under the provisions of § 10 of the Railway Labor Act.[4] It

---

[4] Section 10 of the Railway Labor Act, as amended, 45 U. S. C. § 160, provides:

"If a dispute between a carrier and its employees be not adjusted under the foregoing provisions of this chapter and should, in the judgment of the Mediation Board, threaten substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President, who may thereupon, in his discretion, create a board to investigate and report respecting such dispute. Such board shall be composed of such number of persons as to the President may seem desirable: *Provided, however,* That no member

therefore dismissed the complaint for failure to state a cause of action. The Court of Appeals affirmed. 310 F. 2d 503.

The petitioners insist that, because the Court of Appeals characterized the Organizations' actions as reducing negotiations to "sterile discussion," its opinion must be read as holding that the right of the Carriers to serve the § 6 notices here at issue somehow arose as a penalty for the Organizations' failure to bargain in good faith. No evidence was introduced below as to the good faith of either of the parties during the lengthy bargaining proceedings prior to the institution of this suit, and there is nothing in the record before us to indicate that either party acted in bad faith. Any contrary implication in the opinion of the Court of Appeals is disapproved.

The Court of Appeals concluded, as had the District Court, that the Railway Labor Act procedures had been exhausted, and that therefore the § 6 notices served by the Carriers were proper. The Court of Appeals correctly rejected the contention of the Organizations that the standards contained in the notices themselves violated the Railway Labor Act. As this Court has pointed out, "[t]he Railway Labor Act . . . does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a means by which

appointed shall be pecuniarily or otherwise interested in any organization of employees or any carrier. The compensation of the members of any such board shall be fixed by the President. Such board shall be created separately in each instance and it shall investigate promptly the facts as to the dispute and make a report thereon to the President within thirty days from the date of its creation.

.        .        .        .        .

"After the creation of such board and for thirty days after such board has made its report to the President, no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose."

agreement may be reached with respect to them. The national interest . . . is not primarily in the working conditions as such. So far as the Act itself is concerned these conditions may be as bad as the employees will tolerate or be made as good as they can bargain for. The Act does not fix and does not authorize anyone to fix generally applicable standards for working conditions. The federal interest that is fostered is to see that disagreement about conditions does not reach the point of interfering with interstate commerce . . . ." *Terminal Assn. v. Trainmen,* 318 U. S. 1, 6. See also *Labor Board v. American Ins. Co.,* 343 U. S. 395, 402.

The only question presented, therefore, is whether the record before us sustains the finding of both lower courts that the parties have exhausted the procedures provided by the Railway Labor Act for major disputes such as that involved here. As this Court stated in *Elgin, J. & E. R. Co. v. Burley,* 325 U. S. 711, 725:

> ". . . [t]he parties are required to submit to the successive procedures designed to induce agreement. § 5 First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help. No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration."

The 1960 agreement establishing the Presidential Commission contained a provision purporting to accept the Commission's proceedings as a replacement for the procedures required by the Railway Labor Act. Whether or not such a provision could effectively forestall either party from resorting to the procedures of § 5 of the Act is a question which we need not decide, because the services of the National Mediation Board were in fact specifically invoked by the Organizations, and the Board's procedures were exhausted. Similarly, although arbitration

pursuant to § 7[5] was refused by the Organizations, that section clearly provides that "the failure or refusal of either party to submit a controversy to arbitration shall not be construed as a violation of any legal obligation imposed upon such party by the terms of this chapter or otherwise."

There is, consequently, no question of bad faith or misconduct on the part of either party justifying the other side's unilateral imposition of changes in working rules. What is clear, rather, is that both parties, having exhausted all of the statutory procedures, are relegated to self-help in adjusting this dispute, subject only to the invocation of the provisions of § 10 providing for the creation of an Emergency Board.[6]   And on this basis the judgment below must be, and is

*Affirmed.*

MR. JUSTICE GOLDBERG took no part in the consideration or decision of this case.

---

[5] Section 7 First of the Railway Labor Act, as amended, 45 U. S. C. § 157 First, provides:

"First. Whenever a controversy shall arise between a carrier or carriers and its or their employees which is not settled either in conference between representatives of the parties or by the appropriate adjustment board or through mediation, in the manner provided in sections 151–156 of this title such controversy may, by agreement of the parties to such controversy, be submitted to the arbitration of a board of three (or, if the parties to the controversy so stipulate, of six) persons: *Provided, however,* That the failure or refusal of either party to submit a controversy to arbitration shall not be construed as a violation of any legal obligation imposed upon such party by the terms of this chapter or otherwise."

[6] See note 4, *supra.*

The 1960 agreement establishing the Presidential Commission was "approved" by Secretary of Labor Mitchell.   It provided that the parties accepted its proceedings ". . . as in lieu of the mediation and emergency board procedures provided by Section[s] 5 and 10 of

the Railway Labor Act." In addition, the agreement somewhat inconsistently made provision for the invocation of the services of the National Mediation Board and for national bargaining conferences between the parties immediately following the report of the Commission. Finally, it provided that the agreement was not to be construed as a waiver of any legal right of any of the parties. We have already noted that the parties did in fact exhaust § 5 procedures. Neither party in this Court has contended that the 1960 agreement would affect the applicability of § 10. In any event, it is clear that no private agreement can interfere with the duty of the National Mediation Board or the power which § 10 confers upon the President of the United States.