BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Plaintiff,

v.

SOUTHERN RAILWAY COMPANY et al., Defendants.

Civ. A. No. 2881–62.

United States District Court District of Columbia.

May 14, 1963.

Schoene & Kramer, Washington, D. C., Heiss, Day & Bennett, Cleveland, Ohio, for plaintiff.

Hamilton & Hamilton, Washington, D. C., Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendants.

WALSH, District Judge.

## I. *History of the Litigation*

This action arises from a complaint for an injunction filed by the Brotherhood of Locomotive Firemen and Enginemen on September 10, 1962. The complaint prayed for a preliminary injunction to order the defendant railroads to operate their trains and switching locomotives with a locomotive fireman or helper.

On January 10, 1963, D.C., 212 F. Supp. 465, this Court denied the preliminary injunction in that the extraordinary relief sought was not warranted, absent a full and complete hearing of the case on the merits. Immediately after this Court's denial of the preliminary injunction, the plaintiff informed defendant railroads of its intention to strike for alleged violation of mileage limitations and vacation provisions, commencing on January 13, 1963. The defendants herein filed a complaint for a temporary restraining order on January 12, 1963 (Civil Action No. 123–63) to stay the strike. This Court granted the temporary restraining order, staying the strike until January 22, 1963. This was later extended to February 1, 1963. On January 25, 1963, the Court ordered that the temporary restraining order would remain in effect until three days after determination by the Court of the Brotherhood's complaint in the instant case.

On February 19, 20 and 21, 1963, a full hearing on the merits of the complaint herein was conducted, and subsequently, exhaustive briefs were submitted by the parties.

Before reaching the subject matter of this complaint, a brief history of the collective bargaining agreement, a portion of which is the subject matter of this dispute, seems appropriate.

## II. *History of the Agreement*

In the late 1930's the Diesel locomotive came into limited use on the American railroad. The first Diesel manpower

agreement was concluded in 1937 between the Brotherhood of Locomotive Firemen and Enginemen and a number of Class I railroads. The Southern Railway was not a party to the initial agreement.

In 1943, this agreement was replaced by three regional agreements. The Southern was a party to the Southeastern agreement of May 11, 1944. Section 3 of that agreement reads, in pertinent part, as follows:

"A fireman, or a helper, taken from the seniority ranks of the firemen, shall be employed on all locomotives;"

By the end of World War II, Diesel power had come into more prominent use and was beginning to replace steam locomotion. At this time the Brotherhood proposed a collective bargaining agreement incorporating the above quoted language. Shortly thereafter, the Carolina and Northwestern Railway, a defendant herein, entered into such an agreement on January 10, 1946.

The other railroads of the country did not agree so readily to this proposal. A strike was called by the Brotherhood, an emergency board was appointed and mediation ensued. Subsequently, on May 17, 1950, the remaining defendants entered into a mediation agreement which incorporated the above quoted language as section 4 of the "Diesel Agreement".

It is undisputed that the provision has remained in effect between the parties since 1950; and, is currently incorporated in the agreement of 1959 at page 152 of the printed version.

During the period 1950 to 1959, the parties hereto operated without substantial difficulty with reference to section 4 of the "Diesel Agreement" entered into in 1950. Then, on August 27, 1959, the General Chairman of the Brotherhood complained to the Southern of a shortage of firemen on the Washington Division and the Atlanta Division South, and requested that sufficient firemen be made available to comply with Section 4 of the "Diesel Agreement". The Railroad admitted that there had been a shortage during the summer months, but the shortage resulted from vacation schedules. Correspondence relating to these shortages continued to be exchanged for several months, until finally on July 19, 1960, the respective positions of the parties were stated at a conference between their representatives. At that time, plaintiff asserted that the carriers must hire additional firemen, regardless of the number on furlough, and the carrier maintained that the "Diesel Agreement" required only that they make work available to those on furlough. Thereafter, the President of the Brotherhood "authorized" a strike for July 26, 1960.

Under this emergency condition, the carrier invoked the services of the Mediation Board and the Brotherhood postponed the threatened strike.

On November 29, 1960, Board conferences were recessed, but mediation resumed in December, 1961. Further conferences were held in May of 1962, and on June 4, 1962, the National Mediation Board terminated its jurisdiction without proferring arbitration.

In addition to the above chronicle of events, further action with relation to section 4 of the "Diesel Agreement" has been pursued by the parties. On November 2, 1959, defendants, together with all of the other Class I railroads in the country, filed proposals pursuant to section 6 of the Railway Labor Act (45 U.S.C. § 156). These proposals, among other things, would permit the railroads to operate their Diesels without firemen.

On September 7, 1960, the Brotherhood served a Section 6 notice on the carriers, proposing new rules defining the consist of train crews. Subsequently, on September 16, 1960, the Southern Railway, acting independently from the other carriers of the nation, served a new Section 6 notice; and on October 17 1960, the Southern withdrew from the negotiations of the nationwide Section 6 notice of November 2, 1959.

On May 31, 1962, Southern invoked the services of the National Mediation

Board in regard to their Section 6 notice of September 16, 1960. The Board held conferences in August 1962, and recessed mediation. This controversy is still pending before the National Mediation Board.

The final event in this chronology occurred on January 14, 1963, with defendants submitting their controversy over section 4 of the "Diesel Agreement" to the First Division of the National Railroad Adjustment Board, where it is pending.

### III. *Findings and Conclusions*

Essentially. this dispute involves the interpretation of Section 4 of the Mediation Agreement entered into by the parties on May 17, 1950, and incorporated in their agreement of 1959. This agreement is still in effect and reads, in pertinent part, as follows:

"Section 4. A fireman, or a helper, taken from the seniority ranks of the firemen, shall be employed on all locomotives;".

On or about July 13, 1959, the Southern began operating some trains without firemen or helpers.

Plaintiff contends that this constitutes a violation of Section 2, First; Section 2, Seventh; and Section 6 of the Railway Labor Act (45 U.S.C.A. § 152, First, Seventh; 45 U.S.C.A. § 156).

Defendants contend that the only issues involved here are issues of contract interpretation and application, the resolution of which lies within the primary administrative jurisdiction of the National Railroad Adjustment Board and are not for determination by the court. The defendant Railroads further allege that the above quoted Section 4 of the agreement requires nothing more than that defendants endeavor to man their trains with firemen currently in the seniority ranks. Or, in other words, if firemen are not available, the railroads may operate without firemen; and, in addition, that the defendants are entitled to reduce the number of firemen on the seniority lists through attrition.

Plaintiff contends that the language of Section 4 requires that a fireman shall be employed on each locomotive.

■ The Court agrees that this dispute involves a matter of contract interpretation. Further, that this dispute should be properly settled through the offices of the National Railroad Adjustment Board, where it has been pending since January 14, 1963.

However, the determination that this dispute should be settled through the Adjustment Board does not give the parties the authority to change the conditions which existed under the contract, from 1950 through 1959. This is expressly prohibited by Section 6 of the Railway Labor Act, which states:

"* * * In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proferred its services, rates of pay, rules, or *working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by Section 155* of this title * * *". '(emphasis ours) [45 U.S.C. § 156]

In so holding the Court does not rule on the interpretation of Section 4 of the agreement between the parties. This task is for the Adjustment Board in accordance with the procedures of the Act and in order to effectively utilize the expertise possessed by the members of the Board. As the Supreme Court stated in Slocum v. Delaware, L. & W. R. Co., 1950, 339 U.S. 239, 243, 70 S.Ct. 577, 579, 94 L.Ed. 795, "The Adjustment Board is well equipped to exercise its congressionally imposed functions. Its members understand railroad problems and speak the railroad jargon."

■ This Court is not so equipped. We merely hold that the defendant railroad are not entitled to act independently and effect a new interpretation of Section 4 of their agreement and thereby alter

working conditions in contravention of Section 6 of the Railway Labor Act.

The change in working conditions to which we refer is not the defendants' refusal to hire additional firemen, but rather their practice of operating locomotives without the services of a fireman or helper. It was the practice of the Railroads to operate locomotives with a fireman or helper from 1950 through 1959, presumably because of their understanding that section 4 of their agreement so required. It is not for this Court to say that this *is* required, either by the agreement or by custom and practice; neither is it for the Court to say that the language of section 4 requires that additional firemen be hired to replace those lost by attrition. These matters are for the Adjustment Board.

But it is clear to this court that the practice of operating locomotives with a fireman or helper constitutes a "working condition" within the meaning of Section 6 of the Railway Labor Act. The defendants are prohibited from changing this condition until the Adjustment Board resolves the controversy over the language of section 4 of the agreement between the parties.

In Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co., 1960, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1435, the District Court enjoined a strike by the Brotherhood pending determination of the dispute by the Adjustment Board and imposed conditions to reinstate the *status quo* which existed prior to the issuance of the orders which prompted the strike. The United States Court of Appeals for the Fifth Circuit, in 266 F.2d 335, sustained the injunction but vacated the conditions imposed by the District Court.

The Supreme Court granted certiorari, 361 U.S. 810, 80 S.Ct. 67, 4 L.Ed.2d 59, but limited their review to the following question:

"Whether a district court under circumstances where a dispute arising under the Railway Labor Act has been submitted * * * to the National Railroad Adjustment Board

and an injunction against a strike by employees is sought on authority of Brotherhood of Railroad Trainmen v. Chicago River & Ind. R. R. Co., 353 U.S. 30 [77 S.Ct. 635, 1 L.Ed.2d 622], may on the granting of an injunction impose reasonable conditions designed to protect the employees against a harmful change in working conditions during pendency of the dispute before the Adjustment Board by ordering that the railroad restore the status quo * * * *".

The Supreme Court upheld the injunction and reinstated the conditions which the District Court had imposed. In ruling that the imposition of these conditions did not go to the merits of the contract dispute, the Court, at 363 U.S. 533, 80 S.Ct. 1329-1330, 4 L.Ed.2d 1435, stated:

"Nothing in the record of the proceedings in the District Court suggests that any view on the merits was considered. Instead, the record affirmatively discloses that the district judge was quite aware that it was not his function to construe the contractual provisions upon which the parties relied for their respective positions on the merits. * * *

" * * * It is true that a District Court must make some examination of the nature of the dispute * * *. But this examination of the nature of the dispute is so unlike that which the Adjustment Board will make of the merits of the same dispute, and is for such a dissimilar purpose, that it could not interfere with the later consideration of the grievance by the Adjustment Board."

This is the situation here. Our order will require only a return to the *status quo* until the merits of the dispute are decided by the Board.

The Supreme Court on March 4, 1963, in Brotherhood of Locomotive Engineers, et al. v. Baltimore & Ohio Railroad, et al., 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759, held that the other railroads of the country are now free to resort to self-help to install their section 6 notices

of November 2, 1959 (from which the defendants herein withdrew and subsequently, on September 16, 1960, filed separate section 6 notices). The Supreme Court noted that the railroads involved in that action had concluded mediation and thereby exhausted the statutory procedures. The Southern has not exhausted their statutory remedies as their section 6 notices are still pending before the Mediation Board and their section 4 controversy is before the Adjustment Board.

The issue has been raised as to whether this is a "major" or a "minor" dispute, interpretative terms under the Railway Labor Act. If major, it is generally conceded that the Norris-LaGuardia Act prohibits the issuance of an injunction. Order of Railroad Telegraphers v. Chicago & N. W. Ry. Co., 1960, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774.

However, in the above cited case, suit was brought to enjoin a threatened strike. In the instant case, the Court is asked to require the carriers to return to the *status quo* pending settlement of the dispute. And, as the Seventh Circuit stated in Hilbert v. Penn. R. R. Co., 1961, 290 F.2d 881, cert. denied 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed.2d 963, "Nothing in the Norris-LaGuardia Act prevents a federal court from granting an injunction to require an employer to retain the *status quo*."

In Brotherhood of Railroad Trainmen v. Chicago R. & I. R. Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622, the Supreme Court addressed itself to the question of whether the federal courts can compel compliance with the provisions of the Act to the extent of enjoining a union from striking to defeat the jurisdiction of the Adjustment Board. The court, 353 U.S. at page 40, 77 S.Ct. at page 640, 1 L.Ed.2d 622, held "that the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes. There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved."

Here, the purpose of the Railway Labor Act would be subverted and the jurisdiction of the Adjustment Board would be avoided if the Court permitted the carrier to submit a Section 6 notice to change the working conditions and, prior thereto, institute a new interpretation of that portion of the agreement which is the subject of the Section 6 notice.

■ In the Baltimore & Ohio Railroad case, supra, this same dispute was termed "major" by the Supreme Court. But in that case both parties had exhausted all of the procedures under the Railway Labor Act. Such is not the situation in the instant case as this dispute is pending before both the National Mediation Board and the National Railroad Adjustment Board. The Court, therefore, finds that the Norris-LaGuardia Act does not prohibit this court from issuing an injunction to require the carriers to return to the *status quo* pending determination of the dispute by the National Railroad Adjustment Board.

This Court is mindful of the fact that the Brotherhood has not demonstrated it will suffer irreparable injury absent the mandatory injunction which the union requests. Such a showing is normally required in a court of equity when this extraordinary relief is granted. However, much more is involved here than the private rights and duties of individuals, usually the subject of this equitable relief. We are concerned here with eight separate companies, comprising more than seven thousand miles of railroad, including freight and passenger service, the interests of the public throughout the Southeastern United States, and a large and skilled craft of workmen with a long heritage of service to the railroads. In addition, we have the statutory dictates of Congress, which must be observed by the parties. These considerations place a greater burden on the Court and will not permit disposing of the matter simply on the lack of showing of any irreparable injury by the plaintiff.

As the Supreme Court stated in Virginian Railway Co. v. System Federa-

tion No. 40, 1937, 300 U.S. 515, 551, 57 S.Ct. 592, 601, 81 L.Ed. 789,

> "In considering the propriety of the equitable relief granted here, we cannot ignore the judgment of Congress, deliberately expressed in legislation * * *".

And further,

> "More is involved than the settlement of a private controversy without appreciable consequences to the public. The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern. * * * Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."

In accordance with the foregoing, the Court finds:

1. That it has no jurisdiction over the subject matter of the Section 4 dispute so far as the claims of the respective parties are concerned; that is a matter exclusively within the jurisdiction of the National Railroad Adjustment Board.

2. That a determination of the merits of the dispute over Section 4 of the agreement is now pending before the National Railroad Adjustment Board, the same having been filed on January 14, 1963.

3. That this Court has jurisdiction to issue injunctive relief to maintain the *status quo* during the pendency of the action before the National Railroad Adjustment Board.

The Court therefore will order and direct:

(1) That an injunction issue to return the parties to the *status quo* which existed prior to 1959;

(2) That the defendants will follow the procedures employed in interpretation of section 4 from 1950 to 1959; and further,

(3) That these conditions must be maintained until changed by the determination of the National Railroad Adjustment Board; or

(4) until the agreement is modified in accordance with the Railway Labor Act.

Counsel will submit proper order.