The **DETROIT & TOLEDO SHORE LINE RAILROAD COMPANY**, Plaintiff,

v.

**BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN** et al., Defendants.

No. C 66–207.

United States District Court
N. D. Ohio, W. D.
May 12, 1967.

Robison, Curphey & O'Connell, Toledo, Ohio, for plaintiff.

Mulholland, Hickey & Lyman, Toledo, Ohio, for defendants.

## OPINION

DON J. YOUNG, District Judge.

This cause arises under various provisions of the Railway Labor Act. 45 U.S.C. § 151 et seq. Plaintiff sued the Brotherhood of Railroad Trainmen (hereinafter referred to as the Trainmen), the Brotherhood of Locomotive Firemen and Enginemen (hereinafter referred to as the Firemen), and their respective officers for an order restraining them from striking. The Firemen counterclaimed for an injunction to prevent the plaintiff from violating the status quo provisions of the Act by unilaterally establishing a new terminal point, thereby changing the place where the employees would be required to go on and off duty. The action came on to be heard on October 7, 1966, and testimony and argument were heard at that time. This Court rendered an oral decision in which it refused to grant the injunction against the Unions, while finding for the Firemen on their counterclaim. On November 1, 1966, the findings of fact and conclusions of law of the Court were filed. Plaintiff has now moved for an order vacating the judgment with respect to the Firemen, and for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.

Since rather complete findings of fact have already been made, only a short summary of the facts will be repeated here. For many years Lang Yard in Toledo, Ohio has been the terminal point for train and engine crews going on and off duty, and from which switching services for the Monsanto Chemical plant at Trenton, Michigan was performed. On February 21, 1961 the railroad notified both unions of its intention to establish a new terminal point at Edison Station in Trenton, Michigan. The unions thereafter joined in seeking an amendment of the collective bargaining agreements to cover the changed working conditions pursuant to 45 U.S.C. § 156 by giving what is known as a section 6 notice. The services of the National Mediation Board were invoked but the parties failed to reach an agreement and declined arbitration. It is agreed that at this point the procedures with respect to the handling of the section 6 notice had been exhausted, and both the unions and the company were free to resort to self-help. Thereafter, certain other steps were taken by the Company and the Trainmen but this Court found that these related to the same basic dispute. This being the case, it was the Court's ruling that the dispute was a "major dispute" and that the Court therefore had no jurisdiction to enter an injunction against a strike by the Trainmen because of the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq. That determination is not an issue here since the plaintiff has asked for an order vacating the judgment only with respect to the Firemen.

The facts particularly relevant to the present motion are that on January 27, 1966, the Firemen served a new section 6 notice on the plaintiff and that this time instead of seeking amendments to the bargaining agreement to cover the changed working conditions caused by the establishment of the new terminal point, sought to amend the agreement to establish Lang Yard as the sole terminal point for plaintiff's operations. The services of the National Mediation

Board were again invoked and as of the date of the hearing, the matter was awaiting assignment of a mediator.

On September 19, 1966, plaintiff posted a bulletin advising the employees that Edison Station would be the new terminal point. This would mean that the employees would go on and off duty in Trenton, Michigan, some 30 to 40 miles north of Toledo where they had previously been based.

It was the holding of this Court that the unilateral action by the Company in posting the bulletin changing the terminal point after the services of the Mediation Board had been requested, violated the status quo provisions of sections 5 and 6 of the Act, providing that working conditions shall not be altered by the carrier until the controversy has been finally acted upon by the Board and for 30 days thereafter. The plaintiff's petition was therefore denied with respect to the Firemen, and plaintiff was enjoined from operating a terminal point at Edison Station until the exhaustion of the procedures of the Act. It is this holding which is disputed by the present motion.

It is unnecessary in this case to discuss in detail the "major" and "minor" dispute dichotomy in the Railway Labor Act. Suffice to say that if the dispute is termed major, either party may initiate the procedures of the Act by the service of a notice to change the contract pursuant to section 6.[1] If settlement cannot be reached in conference, the matter is referred to mediation under the auspices of the National Mediation Board, 45 U.S.C. § 155 (1964). The procedure for handling major disputes is designed to assist the parties in reaching agreement, and there is no authority to decide the dispute for the parties unless they agree to submit to arbitration.

 After the parties have exhausted the procedures of the Act, they are free to resort to self-help and the courts may not enjoin a strike by the union nor a unilateral change in rates of pay, rules and working conditions by the carrier. Brotherhood of Locomotive Engineers v. Baltimore & O. R. R., 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963); Order of R. R. Telegraphers v. Chicago & N. W. Ry., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). However, pending exhaustion of such machinery, the parties are required to maintain the status quo. Thus, while the parties are in the process of exhausting the proceedings described above, the railroad may not unilaterally change the rates of pay, rules or working conditions and a court may enjoin such action. 45 U.S.C. §§ 155, 156 (1964); United Industrial Workers of Seafarers v. Board of Trustees, 368 F.2d 412 (5th Cir. 1966).

Plaintiff argues that the present controversy is neither a major nor a minor dispute but rather that it involves a matter of management prerogative.

 For the procedures of the Railway Labor Act to be applicable there must first be a "labor dispute." Thus, for example, if management decided to install new machinery which did not in any way affect the terms or conditions of employment nor violate the collective bargaining agreement, it could do so without prior consultation with the union. If the union takes strike action concerning a non-bargainable matter, a court may issue a strike injunction because the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115, preventing injunctions in "labor disputes" is not applicable. See Chicago & N. W. Ry. v. Order of R. R. Telegraphers, 264 F.2d 254, 260 (7th Cir. 1959), rev'd on other grounds, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960).

The Supreme Court case of Order of R. R. Telegraphers v. Chicago & N. W. Ry., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960) involved facts which were substantially similar to the case at bar. In that case the railroad filed petitions with the public utility commissions in several of the states in which

1. 45 U.S.C. § 156 (1964).

it operated asking permission to eliminate certain of its railroad stations. Recognizing that the plan would result in a loss of jobs, the union gave a section 6 notice to amend the bargaining agreement to state that no position could be abolished or discontinued except by agreement between the carrier and the organization. The Court held that the case grew out of a "labor dispute" and that by reason of the Norris-LaGuardia Act, the district court was without authority to enjoin the strike.

The Norris-LaGuardia Act defines a labor dispute as follows:

> "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment * * *."[2]

The Court said that the controversy clearly involved an effort to change the terms of an existing agreement, and that that term related to a condition of employment. Furthermore, the trend has been to broaden, not narrow the scope of subjects about which workers and railroads may bargain collectively. The Court finally noted that it is "too late now to argue that employees can have no collective voice to influence railroads to act in a way that will preserve the interests of the employees * * *."[3]

Plaintiff attempts to distinguish the *Railroad Telegraphers* case by pointing out that the union there only objected to the abolition of jobs, and did not seek a veto over the carrier's right to determine the location of stations, while in the present case the Firemen seek to amend the agreement to make Lang Yard in Toledo the sole terminal point. The proposed rule actually seeks to establish that all crewmen will report to duty and go off duty at Lang Yard and not 35 miles north of Toledo. Certainly this is a proper subject for bargaining. The controversy concerns the terms of a proposed change in the collective bargaining agreement, and those terms relate to a condition of employment.

Plaintiff argues that Brotherhood of R. R. Trainmen v. New York Cent. R. R., 246 F.2d 114 (6th Cir.) cert. denied 355 U.S. 877, 78 S.Ct. 140, 2 L.Ed.2d 107 (1957) is controlling in this circuit. This Court believes, however, that that case was overruled by the *Railroad Telegraphers* case, and that the present controversy is a labor dispute not involving a matter solely within the discretion of management.

The second contention of the railroad is that even assuming we are dealing with a labor dispute, and that it is a "major dispute," its own action is establishing a terminal at Trenton prior to the termination of mediation with respect to the Firemen's 1966 notice did not violate the status quo provisions of sections 5 and 6 of the Act. The position of plaintiff is that its contract with the Firemen does not prohibit the establishment of new terminals for road service assignments, and that the status quo requirements of section 6 prohibit only changes in rates of pay, rules, or working conditions fixed by the parties' collective bargaining agreement. In other words, section 6 applies only when the proposed change in the agreement directly conflicts with a provision of the present contract. In support of this contention plaintiff cites a report of the National Mediation Board which reads in part as follows:

> "Section 6 states that where notice of intended change in an agreement has been given, rates of pay, rules, and working conditions *as expressed in the agreement* shall not be altered by the carrier until the controversy has been finally acted upon in accordance with specified procedures. Positively stated, section 6 is intended to maintain the contract as it existed be-

---

**2.** 29 U.S.C. § 113(c).

**3.** 362 U.S. 330, 338, 80 S.Ct. 761, 765, 4 L.Ed.2d 774 (1960).

tween the parties until the provisions of the act have been complied with." [4] (Emphasis added.)

But the phrase "as expressed in the agreement" does not appear in section 6 of the Act, and this language appears to have been added by the Board. This Court does not think that such a limitation on the application of the status quo requirements is sound. The general scheme of the statute indicates that the purpose of the status quo provision is to aid the National Mediation Board in its function of helping the parties to reach an agreement. If the carrier can unilaterally change the working conditions of its employees while such conditions are the subject of mediation efforts by the Board, the work of the Board would be greatly hampered. Thus, it would appear that whenever the services of the Board have been invoked, its jurisdiction should be protected by the application of the provisions of section 6 even if the particular condition is not fixed by the existing agreement. There is no reason why the status quo provisions should not apply whenever the Board is mediating a dispute.

Furthermore, the limitation which the plaintiff places on the application of the status quo provision is unsupported by case law. In Williams v. Jacksonville Terminal Co., 315 U.S. 386, 62 S.Ct. 659, 86 L.Ed. 914 (1942) the Court did state that the prohibitions of section 6 against changes in wages and working conditions pending bargaining are aimed at "preventing changes in conditions previously fixed by collective bargaining agreements." [5] However, the facts in that case were not even remotely analogous to the present situation, and the legal issues were different. There had been no previous collective bargaining agreement and there was no history of bargaining between the terminal and certain of its employees called "red caps." However, on October 11, 1938 the red caps notified the terminal that they had selected a union to represent them. The union representative then asked for a conference for the purpose of negotiating a collective bargaining agreement. But no section 6 notice was ever given because there was no existing agreement to amend. The carrier thereafter delivered to each red cap a letter stating that his weekly wage in the future would be the difference between the minimum wage set by the newly enacted Fair Labor Standards Act and the amount of tips received by him each week. An agreement was subsequently reached with regard to working conditions and hours but it omitted any reference to wages. The union representative then sued the terminal for wages due to the red caps under the Fair Labor Standards Act. The union contended among other things that the railroad could not apply the tips to the minimum wage figure because to do so violated the status quo provisions of the Railway Labor Act. The Court held that section 6 did not apply. This result is quite logical because section 6 applies only to intended changes in collective bargaining agreements and there was no agreement in existence to change. The decision of the Court, however, is not relevant to the present controversy, because the Firemen and the plaintiff have an agreement in effect and a section 6 notice has been given proposing that it be changed. The Board's services have therefore properly been invoked, and its jurisdiction to mediate should be protected.

The case of Norfolk & Portsmouth Belt Line R. R. v. Brotherhood of R. R. Trainmen, 248 F.2d 34 (4th Cir.) cert. denied, 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274 (1957), is also not in point. The Court used language which supports plaintiff's contention but it is dictum, since the final determination was that the controversy was a minor dispute.

Thus, the language which the Board read into the Act in its report cited above

4. Thirty-First Annual Report of the National Mediation Board 25 (1965).

5. 315 U.S. 386, 402–403, 62 S.Ct. 659, 669 (1942).

is supported neither by sound reasoning nor by case law. Therefore, this Court will not limit the application of the status quo provisions which are clearly set forth in section 6.

The plaintiff's motion for an order vacating the judgment of this Court entered on November 16, 1966 and for a new trial will therefore be denied.

George F. Taylor, Pittsburgh, Pa., for plaintiff.

Robert F. McCabe, Jr., Pittsburgh, Pa., for Fidelity and Casualty Co. of N. Y.

Warren S. Reding, Pittsburgh, Pa., for T. K. Jacob.

John G. Kish, and James H. Brennan, Pittsburgh, Pa., for Groomes Corporation.