**UNITED TRANSPORTATION UNION**
v.
**PENN CENTRAL TRANSPORTATION COMPANY et al.**
Civ. A. No. 73–2324.

United States District Court,
E. D. Pennsylvania.
Dec. 12, 1973.

Cornelius C. O'Brien, Jr., Philadelphia, Pa., for plaintiff.

Hermon M. Wells, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION AND ORDER

BRODERICK, District Judge.

Plaintiff, United Transportation Union (Union), commenced this action to enjoin the Penn Central Transportation Company (Company), defendant herein, from abolishing certain yard job assignments at the defendant's Pavonia Yard, Camden, New Jersey and Gray's Ferry, Greenwich and Tacony Yards, Philadelphia, Pennsylvania. The Union also seeks to have the Company rescind the abolition of certain yard positions which abolition was carried out in June 1973 at the Morrisville Yard, Morrisville, Pennsylvania. This action was begun on October 15, 1973 when the Union

made application for a temporary restraining order to Emergency Judge Davis. Judge Davis issued an order restraining the defendant from abolishing "present second trick hump" assignments at defendant's Pavonia Yard and the second trick yard assignment at the Gray's Ferry Yard, until further order of the Court. A hearing was set for October 25, 1973, on plaintiff's Motion for a Preliminary Injunction. Pursuant to Rule 65(a)(2) F.R.Civ.P., and by agreement of the parties the Court ordered the trial of the action on the merits to be advanced and consolidated with the hearing of the application for a preliminary injunction.

Plaintiff, a labor organization, represents trainmen (including conductors and brakemen) employed by the Company. The rights and obligations of the Company and its employees who are involved in this case are governed by collective bargaining agreements between the Union and the Company. One of these Agreements is the National Agreement which was signed in May 1951, Article 3 of which provides:

> Section 1. (a) Beginning on the date this Agreement becomes effective on any carrier, such carrier will establish, for all classes or crafts of yard service employes covered by this Article 3, subject to the exceptions contained therein, a work week of forty hours, consisting of five consecutive days of eight hours each, with two days off in each seven, except as hereinafter provided.

The other Agreement consists of rules binding on the parties since September 1942. Rule 5–L–1 provides:

> Yard trainmen shall be assigned for a fixed period of time which shall be for the same hours daily for all regular members of a crew. So far as practi-

cable assignments shall be restricted to eight hours' work.

Prior to June 3, 1973 at all of the terminals of the Company hereinafter discussed, the Company maintained three shifts of crews working twenty-four hours a day, each shift or "trick" working eight hours per day, five consecutive days a week. On or about June 3, 1973, the Company carried out certain changes in the assignments of train crews at Morrisville Yard. The Company abolished the second "trick" assignments to the hump[1] operation which had previously been required to report to work at 3:59 P.M. in Morrisville Yard. Thereafter, the remaining crews working in the hump operation at Morrisville Yard were required to perform several hours of overtime work[2] for which they have been compensated pursuant to the contract at the rate of time and one-half after eight hours. There was evidence[3] showing that the number of cars "humped" between June 1973 and October 1973 was less than the actual number of cars "humped" in the corresponding period in 1972, evidencing some possible diminution of work performed at the hump operation in Morrisville. In the past the hump operation at Morrisville was at times a two-trick operation and at other times a three-trick operation.[4]

On or about October 13, 1973 the Company posted notices to abolish job assignments at the Pavonia Yard, Camden, New Jersey, and at Gray's Ferry, Greenwich and Tacony Yards in Philadelphia, such notices to be effective at 3:59 P.M. on either October 15 or 16, 1973. At the Pavonia Yard the Company's notices would effect an abolition of the entire second shift of crews engaged in the hump operation presently reporting at 3:59 P.M. and the abolition of one hump crew on the third shift. The

---

1. The "hump" operation is the method used to classify railroad cars by sending them down an incline or "hump" onto various tracks so that cars destined for the same area can be grouped together into trains.

2. See Plaintiff's Exhibit # 5.

3. See Defendant's Exhibit # 3.

4. See Defendant's Exhibit # 1 and # 2.

result of these changes would be to place the hump operation on a two-trick basis with crews to report at 7:59 A.M. and 10:30 P.M.

At Gray's Ferry the Company published notices which would effect the abolition of the entire second trick presently reporting at 3:59 P.M. and the necessary services would be performed by two yard crews, one to report at 7:59 A.M. and the other at 10:30 P.M. The Company concedes that said yard crews would normally incur some overtime.

At Greenwich Yard, the Company's notices would effect the abolition of one-half of all crews on all shifts for hump operations. Greenwich continues to operate on a three-trick basis and no conclusive evidence has been adduced as to whether the remaining crews would normally be required to work beyond their eight hour shifts.

At Tacony Yard the effect of the Company's notices would be to abolish two out of the present six crews, one on the second shift and one on the last shift for yard operations. The three trick operation would still continue and the remaining crews would carry on around the clock, i. e., three eight hour shifts.

The Company has changed the "ratables" for the crews remaining at Pavonia and Gray's Ferry Yards. "Ratables" are estimates by the Company of job earnings in a particular position for use in connection with certain wage guarantees under existing agreements between the Company and the Union. Since "ratables" are merely estimates, they do not control the amount of time which the assignment works. The "ratables" for Gray's Ferry and Pavonia Yards were adjusted on October 11, 1973 and October 12, 1973, respectively, to reflect the increased amounts expected to be earned by the remaining crews as a result of the estimated increase in overtime.

Representatives of the Company testified that there would not be regular substantial overtime as a result of the abolition of the aforesaid yard positions

and that overtime is a matter of established practice for yard service employees in the hump operation. The witnesses for the Union, however, testified that the abolition of the yard positions in question would result in yard crews working more than eight hours a day on a regular basis.

After consideration of the conflicting evidence, the Court finds that with the abolition of the second trick at Morrisville, Pavonia and Gray's Ferry Yards working more than eight hours per day will become the rule rather than the exception at these yards. The evidence indicates that the remaining crews at the Morrisville Yard have worked substantial overtime since the abolition of the second trick. At the Pavonia Yard, where the entire second shift will be abolished, the testimony indicates that on the one day the change was in effect, the remaining two shifts worked several hours overtime. Although this may be insufficient to establish that the remaining crews will regularly be required to work overtime, it indicates a possible trend. As to the Gray's Ferry Yard, where the entire second shift will be abolished, the Company has admitted that the remaining crews will be required to work overtime. This evidence, in conjunction with the adjusted "ratables", which reflect the Company's estimates as to the effect of its proposed changes, is an indication that overtime will become more prevalent if not regular in the yard positions in question.

At the Tacony and Greenwich Yards, the second shift at each of these yards has not been abolished but only particular crews in each shift. There is no substantial evidence that crews at these yards will be required to work additional overtime.

The Union contends that it is entitled to an injunction to prevent the Company from unilaterally making these changes. It is the Union's position that Article 3 and Rule 5–L–1 mandate a forty hour work week of eight hours per day for yard service employees and that these provisions prohibit the Company from

establishing assignments which insofar as practicable are not restricted to eight hours per day and forty hours per week. It is asserted that for the Company to make these changes would be impermissible unilateral changes in working conditions already established by the agreements, thereby constituting a "major" dispute between the parties, which is a violation of the Railway Labor Act. Section 6 of the Railway Labor Act provides:

> Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

The Union claims that it is entitled to an injunction to restore and retain the "status quo" until such time as the Company complies with the Act, especially Section 6 thereof. In the alternative,

the Union argues that even if this Court determines that the present dispute is a "minor" one under the Act, this Court nonetheless has the power and jurisdiction to grant an injunction maintaining the status quo until the arbitration procedures of the Act have run their course.

The Company contends that the abolition of the second trick does not constitute a change in the agreements and argues that the provisions relied upon by the Union do not prohibit assignments which contemplate additional overtime by yard and hump crews. The Company contends that it has the unilateral authority to make job assignments which require overtime work of yard employees provided it pays the contract rate for overtime and does not require them to work in excess of the twelve hour limit imposed by the Federal Hours of Service Act. In short, the Company contends that this is a "minor" dispute in that it involves the interpretation and application of existing agreements and as such the matter is one within the exclusive cognizance of the National Railroad Adjustment Board (NRAB). It is the Company's position that nothing in the Railway Labor Act covering grievances or disputes as to the interpretation and application of agreements in any way requires the Company "to maintain the status quo" pending the arbitration of a grievance.

It is clear that the prime reason for the changes sought by the Company is to reduce "idle time" on its hump operations and thus reduce costs. The changes are also in keeping with the Company's belief that existing contract provisions do not in any way restrict the use of crews on an overtime basis, but instead such provisions reserve and recognize the Company's right to require overtime of its yard service crews.[5]

---

5. The Company relies, at least in part, on the following provisions of the agreements as justification for its position:
Section 8(3) provides:
Employes worked more than five straight time eight-hour shifts in yard service in a work week shall be paid one and one-half

times the basic straight rate for such excess work. . . .
Rule Y–C–2 provides:
Extra Yard Trainmen except as indicated below or when changing off where it is the practice to work alternately days and nights for certain periods, working through

The issue facing this Court is whether, under the scheme of the Railway Labor Act, this Court has jurisdiction to enjoin the Company from making the changes outlined above. To place the present controversy in proper perspective, we must first discuss the procedures prescribed under the Railway Labor Act for the treatment of disputes between railroads and unions.

■ As originally drafted by Congress in 1926, the Railway Labor Act, 45 U.S.C. § 151 et seq., was intended to encourage collective bargaining by railroads and their employees in order to prevent wasteful, commerce-crippling strikes.[6] Texas & N. O. R. Co. v. Brotherhood of Railway and Steamship Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L. Ed. 1034 (1930). To this end, the Act established machinery for negotiations, mediation and arbitration to handle disputes between carriers and unions.

The application of the Railway Labor Act, and hence, the jurisdiction of the District Court, is governed by well recognized distinctions between classes of disputes. Under the Act, the courts have classified disputes as either "major" or "minor". In the leading case of Elgin, J. & E. Ry. Co. v. Burley, 325 U. S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945), the Supreme Court described "major" disputes as those "over the formation of collective agreements or efforts to secure them. They arise where there is no agreement or where it is sought to change the terms of one . . . ." The Court then defined a "minor" dispute as one "in which no effort is

made to bring about a formal change in terms or create a new . . . [agreement] . . . [but] relates either to the meaning or proper application of a particular provision with reference to a specific situation."

■■ If a dispute is "minor", the parties must seek to resolve it through negotiation and prescribed grievance procedures; and failing resolution of the dispute, it must then be submitted to binding arbitration by the National Railroad Adjustment Board. 45 U.S.C. § 153. Beyond the initial stages of negotiation, the procedure for major disputes is different. "Major" disputes are subject to mediation by the National Mediation Board, voluntary arbitration, conciliation attempts by the President, and finally if no agreement is reached, to self-help by the parties. Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).

The primary distinction between these procedures as they run their respective courses is the "status quo" requirement of Section 6 of the Railway Labor Act. If the dispute is characterized as "major", Section 6 of the Railway Labor Act specifically provides that the party seeking the change must give at least thirty days' written notice of the change and may not institute the change in rates of pay, rules or working conditions "until the controversy has been finally acted upon . . . by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

two shifts to change off, or where exercising seniority rights, all time worked in excess of eight hours continuous service in a twenty-four hour period shall be paid for overtime on a minute basis at one and one-half times the hourly rate.

Rule 5–L–1 is set out above, p. 2; however, in addition to that part of the rule set out above, there is a *Question* and *Decision* relating to the rule:

*Question:* If a yard crew is assigned for ten hours and for some reason is released at the expiration of eight hours, what number of hours is to be allowed?

*Decision:* A minimum of eight hours. Assignments should be for eight hours and time worked in excess thereof should be paid as overtime.

6. The General Purposes of the Act, 45 U.S. C. § 151a, are:
   (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions;
   (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

If a dispute is "minor" and the parties are unable to resolve it through negotiation or prescribed grievance procedures, then the National Railroad Adjustment Board has primary and exclusive jurisdiction under the Act, 45 U.S.C. § 153, to interpret the agreement of the parties and make an appropriate award. United Transportation Union v. Baker, 482 F.2d 228, 230 (6th Cir. 1973) (Hastie, J., sitting by designation) and cases cited therein. However, in the case of a "minor" dispute the party seeking to exercise a right allegedly established under an existing agreement may proceed to make the change pending a determination by the National Railroad Adjustment Board. Hilbert v. Pennsylvania R.R., 290 F.2d 881 (7th Cir. 1961); Brotherhood of Locomotive Firemen and Enginemen v. Southern Pacific Company, 447 F.2d 1127 (5th Cir. 1971). If the dispute is a "major" dispute, neither party can unilaterally alter the status quo while such a dispute is working its way through the various stages provided in the Act, Brotherhood of Railway Trainmen v. Jacksonville Terminal Company, 394 U.S. 369, 89 S. Ct. 1109, 22 L.Ed.2d 344 (1969); and to do so would be a violation of Section 6 of the Act for which a court may issue an injunction to maintain the status quo. United Transportation Union v. Burlington-Northern, Inc., 458 F.2d 354 (8th Cir. 1972). Section 6 bars any change in rates of pay, rules or working conditions pending a determination of the issues; however, Section 6 does not bar any change pending a determination of a "minor" dispute by the National Railroad Adjustment Board. Order of Railway Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946).

In this case, the Union views the dispute as "major" (i.e., an attempt to impose unilaterally a change in working conditions which constitutes a change in the existing agreements) and the Company views the dispute as "minor" (i.e., a dispute arising out of the application or interpretation of the existing agreements). Judge Hastie, in *Baker, supra,* in seeking to resolve a similar conflict, concluded:

> Confronted by such opposing characterization of particular disputes, the courts of appeals have consistently ruled that if the disputed action of one of the parties can "arguably" be justified by the existing agreement or, in somewhat different statement, if the contention that the labor contract sanctions the disputed action is not "obviously insubstantial", the controversy is within the exclusive province of the National Railroad Adjustment Board.

This Court views the distinction expressed in the above formula as sound. The parties in their briefs and oral arguments fully appreciating the applicable rules of law, vigorously argued and produced evidence as to the meanings and proper interpretations of the agreements.

The Court is convinced, after careful consideration of the law and the evidence, that the dispute between the parties is primarily a conflict as to the proper interpretation of the existing agreements and as such must be regarded as a "minor" dispute. We think it clear after a review of the interrelated provisions of the agreements and the inferences which may be drawn therefrom, together with a review of the evidence of past practices, the Company's contention that the agreements sanction the disputed action is "not obviously insubstantial" and that such action can "arguably" be justified by the existing agreements.

Since we find that the dispute is "minor", it is clear that exclusive jurisdiction to decide the merits of the dispute resides in the National Railroad Adjustment Board. Order of Railway Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946); Slocum v. Delaware L. & W. Ry. Company, 339 U. S. 239, 244, 70 S.Ct. 577, 94 L.Ed. 795 (1950).

The Union contends, nevertheless, that a finding that the dispute is "minor"

does not deprive the District Court of its power to enjoin the Company to maintain the status quo. The Union takes the position that the Court sitting in equity can weigh the competing equities of the parties and issue an injunction in a "minor" dispute enjoining the Company to maintain the status quo until the dispute is determined by the National Railroad Adjustment Board.

■ On the other hand, the Company contends that this Court should not issue an injunction in a "minor" dispute since jurisdiction over such disputes is exclusively in the National Railroad Adjustment Board and that a district court should not interfere until the Board determines the dispute. Order of Railway Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946); Hilbert v. Pennsylvania R.R., 290 F.2d 881 (7th Cir. 1961); Switchmen's Union v. Southern Pacific Company, 398 F.2d 443 (9th Cir. 1968). The Court notes that this is the general rule, but also recognizes that there are exceptions to this rule. There is a line of cases which hold that in a "minor" dispute an injunction to maintain the status quo may issue to preserve the jurisdiction of the National Railroad Adjustment Board and to effectuate the policies and purposes of the Act. Brotherhood of Locomotive Engineers v. Missouri-K-T R.R., 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960); Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Illinois Central R.R. v. Brotherhood of Railroad Trainmen, 398 F.2d 973 (7th Cir. 1968). In these cases, however, the district courts have exercised their equitable jurisdiction to enjoin threatened or actual strikes or work stoppages and have conditioned the injunctions on the maintenance of the status quo until the dispute has been determined by the National Railroad Adjustment Board. But no case has been called to our attention in which a district court has granted injunctive relief in a "minor" dispute in the absence of a threatened or actual strike or work stoppage and prior to submission of the dispute to the National Railroad Adjustment Board. Several cases have gone so far as to indicate that a district court may grant injunctive relief to a union upon a showing of threatened irreparable injury in the absence of a strike or work stoppage situation [7] provided the dispute has already been submitted to the Board. Local Lodge 2144, Brotherhood of Railway, Airline, and Steamship Clerks v. Railway Express Agency, Inc., 409 F.2d 312 (2d Cir. 1969); Westchester Lodge 2186, Brotherhood of Railway and Steamship Clerks v. Railway Express Agency, Inc., 329 F.2d 748 (2d Cir. 1964); Brotherhood of Locomotive Firemen and Enginemen v. Southern Ry., 217 F.Supp. 58 (D.D.C.1963). It would thus appear that submission to the National Railroad Adjustment Board is a threshold requirement for the issuance of an injunction in a "minor" dispute where a union seeks such relief independently of any suit by a railroad for equitable relief, such as a suit to enjoin a threatened or actual strike or work stoppage.

■ In the instant case the record is clear that this "minor" dispute has not been submitted to the National Railroad Adjustment Board and there is no threatened or actual strike or work stoppage from which the Company seeks equitable relief. This Court, thus, has no

7. The logic of this position is well stated in Westchester Lodge 2186, Brotherhood of Railway and Steamship Clerks v. Railway Express Agency, Inc., 329 F.2d 748 (2d Cir. 1964):

> Thus, if the union threatens to strike because of a proposed change in employment conditions, the district court has the power to require retention or restoration of the *status quo* if the carrier seeks to enjoin the strike. The effect of holding that the District Court has no jurisdiction to require retention of the *status quo* pending determination of a minor dispute by the Adjustment Board is to encourage unions to take insincere strike votes to provoke the carrier into seeking an injunction, hoping that the District Court will deem retention of the *status quo* proper.

basis for the assertion of jurisdiction to issue an injunction to maintain the status quo.

This Memorandum Opinion and Order shall constitute the Court's findings of fact and conclusions of law, pursuant to Rule 52(a) F.R.Civ.P.