**ORDER OF RAILWAY CONDUCTORS AND BRAKEMEN, etc., et al., Appellants,**

v.

**SPOKANE, PORTLAND & SEATTLE RAILWAY CO. et al., Appellees.**

No. 20331.

United States Court of Appeals Ninth Circuit.

Aug. 18, 1966.

---

6. United States v. Bass, 271 F.2d 129 (9 Cir. 1959); United States v. Harrington, 269 F.2d 719, 722 (4 Cir. 1959).

Clifford D. O'Brien, Portland, Or., Harry J. Wilmarth, Cedar Rapids, Iowa, for appellants.

Hugh L. Biggs, James P. Rogers, Garry R. Bullard, of Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for appellee.

Before POPE, JERTBERG and DUNIWAY, Circuit Judges.

POPE, Circuit Judge.

A dispute arose between the above named Union and the appellee Railroads concerning allowances to union members for expenses when on duty away from home. When the parties were unable to agree, the Union threatened to strike. The Railroads then brought this suit in the court below to enjoin the strike. From an order granting such an injunction the defendant Union appeals.

Following the extended disputes between numerous railroads and their operating employees relating to rules and working conditions which are recounted in detail in Brotherhood of Locomotive Engineers v. Baltimore & O. R. Co., 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759, and in Brotherhood of Locomotive Engineers v. Chicago, R. I. & P. R. Co., 382 U.S. 423, 86 S.Ct. 594, 15 L.Ed.2d 501 (January 31, 1966), Congress undertook to avoid the consequences of a threatened strike by the unions through the enactment of provisions for compulsory arbitration of two of the issues between the

carriers and the unions. There remained other disputes, not comprehended within this arbitration, which the parties undertook to deal with in what the parties refer to as the "White House Agreement" dated June 25, 1964. The particular portion of that agreement, involved here, was contained in Article II, § 1 thereof, which provided as follows:

"ARTICLE II—EXPENSES AWAY FROM HOME:

"Section 1—

"When the carrier ties up a road service crew (except short turnaround passenger crews), or individual members thereof, at a terminal (including tie-up points named by assignment bulletins, or presently listed in schedule agreements, or observed by practice, as regular points for tying up crews) other than the designated home terminal of the crew assignment of four (4) hours or more, each member of the crew so tied up shall be provided suitable lodging at the carrier's expense or an equitable allowance in lieu thereof. Suitable lodging or an equitable allowance in lieu thereof shall be worked out on a local basis. The equitable allowance shall be provided only if it is not reasonably possible to provide lodging.

"If an allowance is being made in lieu of lodging as well as other considerations under provisions of existing agreements, the amount attributed only to lodging shall be removed if suitable lodging is supplied, or offset against an equivalent allowance. This shall be worked out on a local basis.

"The provisions of this Section shall be made effective at a date no later than 30 days following the effective date of this Agreement."

The lodging referred to is the lodging required by the employees during their layovers at the end of their runs.

At conferences following this agreement the parties attempted to agree on what would be considered "suitable lodging or an equitable allowance in lieu thereof," but without success. On July 24, 1964, the appellee railroads issued and served on the appellants its "Circular No. 65" as follows:

"SPOKANE, PORTLAND AND SEATTLE RAILWAY COMPANY SYSTEM LINES

Portland, Oregon
July 24 1964

Circular No. 65

ALL CONCERNED:

Effective July 25, 1964 and until further notice, whenever a road service crew is tied up at a terminal other than the designated home terminal of the crew assigned for four hours or more, each member of the crew so tied up will be provided lodging at the following locations:

Spokane—Coeur d' Alene Hotel
Pasco—Pioneer Hotel
Wishram—SPS Hotel
Bend—Colonial Hotel
Albany—Albany Hotel
Eugene—Lane Hotel
Astoria—Astor Hotel
Seaside—Chillquist Rooming House
Vernonia—Hy-van Hotel

A survey recently taken of lodging then being used by train and enginemen at the above points indicated that while some were using accommodations listed above, others had made different lodging arrangements. Therefore, although accommodations will be available at the above named establishments, if any crew member desires to keep his present arrangement, he may do so in which event he will be allowed $1.50 for each layover period during which he is tied up for more than four hours at the away-from-home terminal of his assignment. This allowance may be claimed on the service slip for the particular trip.

While the above arrangement is in effect, the allowance in lieu of lodging presently being made to certain train crew members in pooled caboose territory will be removed.

J. L. Monahan
Superintendent"

■ On August 3 following, the union sent to the railroad [1] a notice as follows:

"Our negotiations to date have failed to produce an agreement as to the type, quality or location of suitable lodging, or equitable allowance in lieu thereof. We propose that an agreement be reached in accord with Section 6 of the Railway Labor Act, which will provide that acceptable suitable lodging shall include:

"(1) A large single room, well ventilated, heated, lighted, air conditioned, with bath facilities, well finished wood or carpeted floors and closet or large locker storage space. Room is to be equipped with chairs and dresser and full size standard bed with new Simmons 400 mattress and springs, or one of equal quality. Room to be maintained in a suitable manner with linen to be changed after each use.

"(2) The lodging mentioned in Paragraph (1) to be located not more than one-fourth miles from point where crews are required to register and/or off duty, or suitable transportation furnished between lodging and points of reporting for duty, or going off duty. Call service will be provided by carrier.

"(3) In lieu of requirements of above Paragraphs (1) and (2), an equitable allowance per trip will be six dollars ($6.00) to be paid by check separate and apart from wages and earnings.

"Please advise me promptly whether you are agreeable to these provisions, or as to a date for conference concerning this proposal, as provided by the Railway Labor Act."

For the purpose of clarifying what next happened, we note that the Railway Labor Act (45 U.S.C. § 151 et seq.) provides two separate and distinct methods for the settlement of disputes between carriers and their employees. Section 3 of the Act (45 U.S.C. § 153) which establishes a National Railroad Adjustment Board provides that disputes "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes." (45 U.S.C. § 153(i)) Disputes of this character are known as "minor" disputes. Their submission to the National Railroad Adjustment Board is "considered as compulsory arbitration in this limited field," and awards in such cases are "final and binding upon both parties," and in case of attempted violation of such an award through a strike the "District Court has jurisdiction and power to issue necessary injunctive orders * * * notwithstanding the provisions of the Norris-La Guardia Act." Brotherhood of Railroad Trainmen v. Chicago R. & I. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622.

■ As the Court there noted, these so-called "minor disputes" "may be contrasted with 'major disputes' which result when there is disagreement in the bargaining process for a new contract." [2] In Elgin, J. & E. R. Co. v. Burley, 325

---

1. The action was brought by Spokane, Portland & Seattle Railway Company, a Washington corporation, Oregon Trunk Railway, a Washington corporation, and Oregon Electric Railway Company, an Oregon corporation. The last two companies were subsidiaries of the first one named. All three are referred to hereinafter as "the railroad".

2. Or where disagreement relates to changes of pay, rules, or working conditions as embodied in existing agreements. See Title 45 U.S.C. § 152 Seventh, which reads as follows: "No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."

U.S. 711, at pages 722 to 727, 65 S.Ct. 1282, at pages 1289–1292, 89 L.Ed. 1886, the Court defined and described the two kinds of disputes. Speaking of "major disputes" the Court said (p. 723, 65 S.Ct. p. 1290): "They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past."[3] The Court then proceeded to note the divergent procedures prescribed for dealing with the two kinds of disputes. It said (p. 725, 65 S.Ct. p. 1290): " 'Major disputes' go first to mediation under the auspices of the National Mediation Board; if that fails, then to acceptance or rejection of arbitration, cf. § 7; [Brotherhood of Railroad] Trainmen v. Toledo, P. & W. R. Co., 321 U.S. 50, 64 S.Ct. 413, 88 L. Ed. 534, 150 A.L.R. 810; and finally to possible presidential intervention to secure adjustment. § 10. For their settlement the statutory scheme retains throughout the traditional voluntary processes of negotiation, mediation, voluntary arbitration, and conciliation. Every facility for bringing about agreement is provided and pressures for mobilizing public opinion are applied. The parties are required to submit to the successive procedures designed to induce agreement. § 5 First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help. No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration."

For a case in which this court dealt with the distinctions between these two kinds of disputes, see Butte, Anaconda & P. Ry. Co. v. Brotherhood of L. F. & E., 9 Cir., 268 F.2d 54.

After the railroad and the Union had exchanged their two notices, quoted above, the railroad's notice of July 24 and the Union's notice of August 3, 1964, they had conferences in an attempt to resolve their differences, but without success. Not only were they unable to agree upon what allowance or lodgings "away from home" should be furnished, but they were in sharp disagreement as to the character or nature of their dispute, and as to the steps necessary to be taken in an effort to resolve it. It will be noted that in its August 3 notice the Union referred to an agreement to be reached "in accord with Section 6 of the Railway Labor Act." This section (45 U.S.C. § 156) deals with a "major dispute". By letter of August 10, 1964, the railroad challenged this reference to § 6, asserting that this was a dispute "involving the interpretation or application" of Article VII of the agreement of June 25, 1964. About the same time the Union invoked mediation on the part of the Mediation Board. The Mediation Board took no action at that time, apparently because it was advised that the parties, as of September 15, 1964, agreed to maintain the status quo pending further negotiations. This agreement operated to bring about a cancellation of a strike which the Union was then threatening.

There followed a succession of efforts to reach agreements, all without success, and finally, about June 2, 1965, the Union notified the Mediation Board that because of the railroad's "refusal to bargain realistically on our Section 6 notice of August 3, 1964," the Union had authority to strike. The Mediation Board

---

3. The Court described "minor disputes" as follows: "The second class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e. g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future."

notified the railroad of this, and the Union notified the railroad it would strike on June 7, 1965. On June 3, 1965, the railroad submitted its version of the dispute to a Special Board of Adjustment which the parties had set up by agreement in October 1961. When the Union objected to the submission of the dispute to such Special Board the railroad submitted the stated dispute to the National Adjustment Board.

It is the railroad's position that "this dispute was and is one involving only the interpretation of an existing agreement" between the parties, as set forth in Article II, Section 1 of the June 25, 1964 White House Agreement; hence, it is a "minor dispute" which the Adjustment Board had jurisdiction to determine by an award which would be final and binding upon both parties. It follows, the railroad says, and the trial court held, that the strike was "unlawful and enjoinable." [4]

■ If the dispute here involved was a "major" one, the strike was not subject to injunction. As we noted in Butte, Anaconda & P. Ry. Co. v. Brotherhood of L. F. & E., supra, at p. 58, "Major disputes go first to mediation before the National Mediation Board; if that fails, then to acceptance or rejection of arbitration; and finally to possible presidential intervention. If all this fails, compulsory processes are at an end, and either party may resort to self-help."

■ We are thus confronted with the single question, whether this case involves a "major" or a "minor" dispute. It may be assumed, but without deciding, that both parties might have agreed to submit to the Adjustment Board the simple question as to the meaning, or proper

interpretation, of what would be "suitable lodging or an equitable allowance in lieu thereof." But the Union had the right, if it chose, to seek an addition of new provisions to this part of the White House Agreement. The Railway Labor Act contemplates such changes in or additions to agreements. Section 6 of the Act (45 U.S.C. § 156) is entitled: "Procedure in changing rates of pay, rules, and working conditions." The only restrictions there stated are that there should be "thirty days' written notice of an intended change," and that if conferences are being held, or if services of the Mediation Board have been requested, the proposed changes shall not go into effect until after a stated period following termination of conferences, or until mediation has been completed.

In our view, there can be no question but that the Union's notice of August 3, 1964, was a notice of an intended change in the terms of the agreement. That it was so intended is made plain by its recital that it was proposed "that an agreement be reached in accord with Section 6 of the Railway Labor Act." This notice did not purport to be a proposed interpretation of the earlier Article II, Section 1; its proposals are obviously new arrangements. That Article II, Section 1 contemplated that there would be some new provisions made is apparent from its reference to certain terms being "worked out on a local basis." This seems to us to suggest further negotiations.[5] We hold this to have been a "major" dispute.

■ The railroad suggests that even if this were a major dispute, yet the Union had no right to resort to self-help by way of strike until mediation through the Mediation Board had been under-

4. Counsel for the railroad have furnished us with an opinion of the District Court for the District of Minnesota in a case entitled Great Northern Railway Company v. Order of Railway Conductors and Brakemen, et al., dated March 9, 1966, and so far unreported. In that case, not distinguishable from this one, the court granted an injunction for reasons similar to those stated by the court below. Our decision here discloses that we cannot agree with that decision either.

5. This is readily understood when we recall that the "White House Agreement" as framed was nation-wide covering many carriers. The possible desirability of modifications on separate railroad systems seems apparent. Indeed, the very loose and very general language of the earlier agreement does not readily lend itself to "interpretation".

taken, followed by at least an attempt at arbitration under Section 7 (45 U.S.C. § 157). But the railroad is in no position to make such a contention. The Union made an effort to utilize the procedures of the Mediation Board. In response to the Union's notice of August 3, 1964, the railroad advised the Union that it considered that notice improper, indeed a "specific violation of the Agreement." In response to an inquiry by the Mediation Board as to its views of the Union's invocation of mediation, the railroad replied that it was continuing negotiations concerning the dispute. Later, in response to a similar inquiry by the Mediation Board, the railroad asserted that the Union's invocation of mediation pursuant to its "purported Section 6 notice" was "in clear violation of * * * the Agreement and, consequently, of the Railway Labor Act." Brotherhood of Railroad Trainmen v. Toledo, P. & W. R. Co., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534, is precisely in point here. It forecloses the railroad, which positively rejected mediation, from claiming an injunction against a strike.

When this opinion came to this point it was circulated. The dissenting opinion followed. The author assumes full responsibility for having through the opinion's inadequacy evidently led the author of the dissent to misunderstand completely the thrust of the court's opinion. A reference to the dissent's concluding paragraphs indicates that the dissent proceeds upon the theory that the primary basis for the court's opinion is the fact that the Union labeled its notice as one made in accord with § 6 of the Railway Labor Code. This circumstance is mentioned in the opinion but it concerns no more than the intent with which the Union served its notice; there is no suggestion that its reference to § 6 determined its character.

We state and reemphasize the following propositions:

1. The original agreement was no part of the compulsory arbitration arrangement referred to in the cases cited in the earlier portion of this opinion. It was referred to as the "White House Agreement" but it had no more impact or finality than any other collective bargaining agreement arrived at through negotiations between union and employer.

■■ 2. Section 6 of the Railway Labor Act (45 U.S.C. § 156) provides for the very thing the Union was seeking here. To use the language of Elgin, J. & E. R. Co. v. Burley, supra, the Union was attempting "the formation of collective agreements" and making "efforts to secure" something it did not have. The issue was "not whether an existing agreement controls the controversy." The Union's efforts, its disputes, "look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." It is immaterial whether the previously existing collective bargaining agreement specifies a particular method of settling disputes such as that found in Article VII, which is quoted in the dissent; such a stipulation, like any other stipulation in a labor agreement, may be amended as positively provided in § 6, and no act or agreement of the parties may limit, qualify or take away the right of one party to propose or attempt "the acquisition of rights for the future".

3. The provisions of § 1 Article II of the original agreement, quoted above, are so indefinite that it is doubtful if it is susceptible of a meaningful interpretation. The only description it gives of lodging or allowances are found in the words "suitable lodging" and "equitable allowance." In the nature of the case, these phrases suggest further negotiations between the parties. An adjustment board is in no position to define what is "suitable" or "equitable". And the section itself says as much, when it says: "Suitable lodging or an equitable allowance in lieu thereof shall be worked out on a local basis." "Worked out" surely means "negotiated for". And so the Union here, desiring to acquire specific "rights for the future", made this specific proposal in its August 3 notice. It is not suggested that such a change or addition to the agreement could be accomplished by unilateral action. What § 6 provides for is a means for proposing

a change or, as stated in the Elgin case, supra, a mode for making efforts that "look to the acquisition of rights for the future." The Mediation Board may attempt to mediate any unresolved dispute over such a proposal (§ 5; 45 U.S.C. § 155) and attempt to induce the parties to arbitrate, failing which, in the absence of an Emergency Board (§ 10; 45 U.S.C. § 160) the parties are "relegated to self-help" and free to exercise it. Brotherhood of Locomotive Engineers v. Baltimore & O. R. Co., supra, 372 U.S. at pp. 289–291, 83 S.Ct. 691.

4. Any other interpretation of the situation here would mean that the Union would be completely at the mercy of the Adjustment Board which would be at liberty under its compulsory arbitration powers to accept and enforce the contentions of the railroad regardless of what the Union may do or say. This is the interpretation insisted on in the dissent. The only reasonable interpretation of the facts and the law here is that the Union is not compelled to leave itself open to compulsory arbitration as to the meaning of indefinite terms like "suitable" or "equitable". Therefore, under § 6 of the Act the Union may seek a change in the terms of the original contract.

■ 5. That is precisely what the Union sought here. The Union made the proposal which it had the statutory right to do. The proposal was that there be added to the contract which merely called for something "suitable" or "equitable" a new provision stating in specific and precise terms just what the Union members should be entitled to in respect to lodging. That what is proposed is not an interpretation but something new is plain from a reading of the terms stated by the Union. These provisions "look to the acquisition of rights for the future". These new terms called for a "large single" room; "well ventilated" rooms; "heated" rooms; "air conditioned" rooms; "well finished wood or carpeted floors"; "closet or large locker storage space"; "chairs and dresser"; "standard bed"; it specified a type of "mattress and springs", "linen to be changed", location "not more than one-quarter miles",

"suitable transportation", "call service", "allowance of $6.00". All these things are foreign to the paragraph of the original agreement which deals with the subject of lodging. In our view this is obviously something new. It is a change of the character contemplated by § 6.

It appears to be implicit in the dissenting opinion that because of Article VII of the original agreement, or for some other reason, the Union had no right to make or propose a change in the working conditions in the respects here involved. That cannot be.

It follows from our holding that the dispute here involved was a "major" one that the grant of an injunction was improper.

The judgment is reversed.

DUNIWAY, Circuit Judge:

I dissent. In my opinion the dispute is a minor dispute falling under section 3, not a major dispute falling under section 6. I cannot quarrel with my brother Pope's opinion as an exercise in judicial logic. It says that the union's notice of August 3, which refers to section 6 of the Act, sought "an intended change in agreements affecting rates of pay, rules, or working conditions" (section 6). Hence a dispute falling within section 6 was created. My difficulty is with his premise. It is a too simple solution of a complex problem. It seems to me to disregard what I consider basic, the language and the purpose of the 1964 White House Agreement, as well as the purpose of sections 3 and 6.

Two provisions of that agreement, which was a nationwide settlement following threat of a most serious nationwide strike, are particularly pertinent here. With specific reference to the away-from-home expenses of train crews, Article II, Section 1 of the Agreement provides:

"When the carrier ties up a road service crew (except short turnabout passenger crews), or individual members thereof, at a terminal (including tie-up points named by assignment bulletins, or presently listed in schedule

agreements, or observed by practice, as regular points for tying up crews) other than the designated home terminal of the crew assignment for four (4) hours or more, each member of the crew so tied up shall be provided suitable lodging at the carrier's expense or an equitable allowance in lieu thereof. Suitable lodging or an equitable allowance in lieu thereof shall be worked out on a local basis. The equitable allowance shall be provided only if it is not reasonably possible to provide lodging.

"If an allowance is being made in lieu of lodging as well as other considerations under provisions of existing agreements, *the amount attributed only to lodging shall be removed if suitable lodging is supplied,* or offset against an equivalent allowance. This shall be worked out on a local basis.

"The provisions of this section shall be made effective at a date no later than 30 days following the effective date of this Agreement."

This was as definite a settlement of this issue, on a national basis, as could be made. Local conditions vary widely; therefore this provision was to be "worked out" locally. But there is no indication that these matters were to be "worked out" outside the definitions and limitations laid down in the agreement itself: "suitable lodging" or an "equitable allowance," and the latter "only if it is not reasonably possible to provide lodging," plus a requirement that existing allowance in lieu of lodging is to be removed if "suitable" lodging is supplied. Under the agreement the carrier is required to provide lodging or an allowance. All that remains is to determine what lodging is "suitable" and "reasonably possible to provide," and what allowance is "equitable." Surely this requires that when the parties undertake to work these matters out on a local basis, they do so within those definitions and limitations. To say that defining what lodging is

"suitable" and what allowance is "equitable" under a given set of circumstances is not "interpretation" within the meaning of section 3, is to me a far too restrictive view of what "interpretation" means, in the context in which it is used in section 3. And to say that working out these matters is not "application" within the meaning of section 3, is also, to me, a far too restrictive view of what "application" means in that context.

I think that the parties to the White House Agreement intended that this type of dispute be a section 3 dispute. Article VII of that agreement provides:

"Any dispute involving the interpretation or application of this agreement shall be settled by the parties in accordance with the established procedures therefor, *including the creation of Special Boards of Adjustment and other procedures of Section 3 of the Railway Labor Act.*" (Emphasis added.)

What happened here is completely consistent with an attempt to interpret and apply Article II, Section 1 of the Agreement. Being unable to reach an agreement as to what lodging was "suitable" and what allowance was "equitable," the carrier, by its July 24 notice, put into effect its version, which states what accommodations it will provide and what allowance in lieu thereof it will pay. The union's August 3 notice, while stated to be "in accord with section 6", is in fact no more than a statement of its version of what shall constitute "acceptable suitable lodging" and what shall be "an equitable allowance." These are the terms used by the union. They are also the terms used in Article II, section 1. They are nothing but an attempt to interpret and apply the White House Agreement.

The reference in the union's notice to section 6, when the notice itself discloses that that section is not applicable, cannot, in my opinion, change what is in fact a section 3 dispute into a section 6 dispute.[1] This is because section 6 is ap-

---

[1]. "The voice is Jacob's voice, but the hands are the hands of Esau." (Genesis XXVII, 22). Isaac was blind. This court is not, nor does the law require that it act as if it were!

plicable only if there is to be a *"change in agreements* affecting rates of pay, rules, or working conditions" (emphasis added). Here the union can perhaps be said to have sought a change in "rules" or "working conditions," and even in "rates of pay" as to the in lieu allowance. But it sought them *within* the White House Agreement: it sought interpretation and application of that agreement; it did not seek a "change in [that] agreement."

I think that it is a disservice to the cause of peaceful settlement of railway labor disputes, as carefully worked out in section 3, to hold that a union can so easily escape its obligations by merely labelling a section 3 dispute a section 6 dispute. I also think that in the White House Agreement both parties agreed and intended that this dispute be a section 3 dispute, as is witnessed by Article VII. I do not think that the union should now be permitted, by a mere verbal device, to repudiate and dispute so important an agreement.

I would affirm.