OPINION
OWENS, Circuit Judge:
Aircraft Service International, Inc., doing business as Aircraft Service International Group (“ASIG”), sought and obtained a preliminary injunction from the district court in October 2012 prohibiting ASIG’s employees from striking at Seattle-Tacoma International Airport (“Sea-Tac”). Section 8 of the Norris-LaGuardia Act (“NLGA”) strips district courts of jurisdiction to enter such an injunction unless the party seeking relief has made “every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.” 29 U.S.C. § 108. Because the district court failed to consider whether ASIG satisfied this provision and the record lacks any evidence that ASIG did so, we reverse and vacate the preliminary injunction.
I. FACTS AND PROCEDURAL HISTORY
ASIG is responsible for refueling about 75 percent of the airplanes at Sea-Tac. The dispute at issue arose when ASIG indefinitely suspended one of its fuelers, Aex Popescu, on September 14, 2012. Po-pescu and other ASIG fuelers allege that he was suspended “in retaliation for his leadership on workplace safety issues, including testifying at a public hearing of the Seattle Port Commission.” ASIG counters that Popescu was suspended “so it could investigate reports that [he] had engaged in inappropriate conduct at the workplace.”
Ater his suspension, Popescu and other ASIG fuelers decided to organize a “group response” to press for his reinstatement. Working Washington, a local coalition “united in support of quality jobs and a fair economy,” was heavily involved in this effort. Jonathan Rosenblum is Working Washington’s “Campaign Director.” After unsuccessfully advocating for Popescu’s reinstatement for two weeks, and at Working Washington’s recommendation, the fuelers began distributing strike ballots on September 28. “[B]y an overwhelming margin,” the fuelers voted to approve a strike to “get Aex Popescu back to work and to protest retaliation and intimidation by ASIG.” Working Washington held a press conference soon after to publicize the fuelers’ vote. Two days after this press conference, ASIG filed a complaint in the Western District of Washington seeking to enjoin any anticipated strike. This chain of events is summarized as follows:
• September 14, 2012: ASIG suspends Popescu.
• September 17, 2012: Popescu meets with the local ASIG station manager to discuss reinstatement and investigatory process.
• September 25, 2012: Several ASIG fuelers allegedly call ASIG’s Human Resources Department to ask for Po-pescu’s reinstatement.
■• September 28-30, 2012: Working Washington distributes and collects strike ballots.
• September 30, 2012: The strike ballots are counted.
• October 3, 2012: Working Washington holds a press conference publicizing the strike vote.
*1072 • October 5, 2012: ASIG files a complaint for injunctive and declaratory relief.
The district court issued a temporary restraining order on October 5, 2012, prohibiting the fuelers from engaging in any strike activity “or other concerted action which is intended to interfere with ASIG’s operations.” After a hearing, the district court issued the following preliminary injunction on October 18, 2012:
Alex Popescu, Working Washington, Jonathan Rosenblum, and John Does 1-100, and their officers, agents, employees, and members are hereby preliminarily enjoined from in any manner or by any means directing, calling, causing, authorizing, inducing, instigating, conducting, continuing, encouraging, or engaging in any strike, work stoppage, sick-out, slow-down, work-to-rule campaign, or other concerted action in violation of the [Railway Labor Act] which is intended to interfere with ASI[G]’s normal operations.
(footnote omitted).
In granting this preliminary injunction, the district court assessed whether ASIG had satisfied the four prongs of the Winter test: (1) the moving party is likely to succeed on the merits; (2) irreparable harm is likely if the injunction is not granted; (3) the balance of equities tips in the moving party’s favor; and (4) an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Acknowledging that the “parties spen[t] very little time briefing the other three criteria,” the district court devoted the lion’s share of its analysis to the first prong—in particular, Defendants’ contention that the Railway Labor Act (“RLA”) does not govern the dispute. The district court relied on both the RLA’s stated purpose of avoiding interruptions to commerce and its prohibition on “strike-first tactics” in concluding that the Act prohibited Defendants’ proposed strike.
The district court then addressed Defendants’ argument that it had “no authority to issue an injunction because the NLGA forbids it from doing so.” Citing Burlington Northern Railroad v. Brotherhood of Maintenance of Way Employees, 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987), and Pittsburgh & Lake Erie Railroad v. Railway Labor Executives’ Ass’n, 491 U.S. 490, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989), the district court concluded that the RLA trumped the NLGA. The district court entered the injunction without analyzing or citing Section 8 of the NLGA. ..
II. STANDARD OF REVIEW
“We review the legal determination of whether the district court had the power to issue an injunction de novo, but review the district court’s exercise of that power for abuse of discretion.” Cont’l Airlines, Inc. v. Intra Brokers, Inc., 24 F.3d 1099, 1102 (9th Cir.1994). “Abuse-of-discretion review is highly deferential to the district court,” but “[w]hen a district court makes an error of law, it is an abuse of discretion.” Microsoft Corp. v. Motorola, Inc., 696 F.3d 872, 881 (9th Cir.2012) (internal quotation marks omitted). We review all legal interpretations underlying an injunction de novo. Id.
III. DISCUSSION
The NLGA generally divests federal courts of jurisdiction to “issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions óf [the NLGA].” 29 U.S.C. § 101. Two provisions of the NLGA are relevant to this case: Section 4 and Section 8. Under Section 4, “in any case involving or growing out of any labor dispute,” federal courts are prohibited from issuing an injunction to prohibit any person from “[e]easing or refus *1073 ing to perform any work,” i.e., striking. Id. § 104(a). Under Section 8, federal courts are prohibited from issuing injunc-tive relief to “any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.” Id. § 108. Section 8 is called the NLGA’s “clean hands” provision. Bhd. of R.R. Trainmen, Enter. Lodge, No. 27 v. Toledo, P. & W. R.R., 321 U.S. 50, 60, 64 S.Ct. 413, 88 L.Ed. 534 (1944) (quoting 75 Cong. Rec. 5464 (1932) (statement of Rep. John O’Connor)) (internal quotation marks omitted).
‘ The parties do not dispute that this case involves a “labor dispute” for purposes of the NLGA. Accordingly, the district court lacked jurisdiction to issue a preliminary injunction unless it could overcome the restrictions of Sections 4 and 8.
A. Background of the Norris-LaGuar-dia Act and the Railway Labor Act
The Norris-LaGuardia Act was enacted to “tak[e] the federal courts out of the labor injunction business.” Jacksonville Bulk Terminals, Inc. v. Int’l Longshoremen’s Ass’n, 457 U.S. 702, 712, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982) (emphasis omitted). Before its passage in 1932, “federal courts routinely enjoined labor picketing at the behest of employers.” Burlington N. Santa Fe Ry. Co. v. Int’l Bhd. of Teamsters Local 174, 203 F.3d 703, 707 (9th Cir.2000) (en banc); see Milk Wagon Drivers’ Union, Local No. 753 v. Lake Valley Farm Prods., 311 U.S. 91, 102, 61 S.Ct. 122, 85 L.Ed. 63 (1940) (citing congressional report that “approximately 300 [injunctions] were issued in connection with the railway shopmen’s strike of 1922”). “This practice was derisively dubbed ‘government by injunction.’ ” Burlington N. Santa Fe Ry. Co., 203 F.3d at 707 (quoting Milk Wagon Drivers’ Union, 311 U.S. at 102, 61 S.Ct. 122).
Seeking injunctive relief was popular among employers because of its “unique effectiveness in stifling labor disputes.” Id. “[Preliminary injunctions enabled employers to defeat unions instantly by preventing them from using self-help and destroying the momentum of strikes before substantive legal rights were litigated.” Id.; see also Felix Frankfurter & Nathan Greene, The Labor Injunction 17 & n.71 (1930). Employers typically sought relief in federal courts because “federal judges tended to be more hostile to labor than state court judges.” Burlington N. Santa Fe Ry. Co., 203 F.3d at 708. Rather than attempt to amend the substantive law to remedy this “extraordinary problem,” Congress felt compelled to take the “extraordinary step of divesting federal courts of equitable jurisdiction” over these disputes. Burlington N. R.R. v. Bhd. of Maint. of Way Employees, 481 U.S. 429, 437, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987). Thus was born the NLGA.
The Railway Labor Act was enacted with a different goal in mind: “[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein.” 45 U.S.C. § 151a. Passed in 1926, the RLA was intended to quell the persistent labor unrest that “threatened] disruption of transportation.” Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R., 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). Finding existing voluntary mechanisms inadequate, the major railroad carriers and unions came together to craft a mandatory system of dispute resolution. Id. The result was the RLA’s “virtually endless” process of “negotiation, mediation, voluntary arbitration, and conciliation.” Burlington N. R.R., 481 U.S. at 444, 107 S.Ct. 1841 (internal quotation marks omitted). The hope was that future labor disputes would *1074 be resolved through this process, and not through disruptive strikes. See id. at 451, 107 S.Ct. 1841. Congress extended the “same benefits and obligations” of this process to the fledgling air transportation industry in 1936. Int’l Ass’n of Machinists v. Cent. Airlines, Inc., 372 U.S. 682, 685, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963); see 45 U.S.C. §§ 181-188.
B. Interplay Between the Railway Labor Act and the Norris-LaGuardia Act
The relationship between the RLA— with its goal of keeping the trains and planes running—and the NLGA—with its goal of keeping federal courts out of the labor injunction business—has always been somewhat unclear. See 75 Cong. Rec. 5504 (1932) (statement of Rep. Fiorel-lo LaGuardia) (inquiring about an apparent “tie-up” between the provisions of the RLA and the NLGA). Although Section 4 of the NLGA is phrased in absolute language, the'Supreme Court consistently has held that the “competing demands of the RLA and the Norris-LaGuardia Act” must be “accommodate[d].” Burlington N. R.R., 481 U.S. at 445, 107 S.Ct. 1841; see also Int’l Ass’n of Machinists v. Street, 367 U.S. 740, 772-73, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); Graham v. Bhd. of Locomotive Firemen & Enginemen, 338 U.S. 232, 239-40, 70 S.Ct. 14, 94 L.Ed. 22 (1949); Virginian Ry. Co. v. Sys. Fed’n No. 40, 300 U.S. 515, 563, 57 S.Ct. 592, 81 L.Ed. 789 (1937). In practice, this means that the RLA has been read as creating an exception to the NLGA. Yet the boundaries of this exception are narrow. Although the “specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act,” Pittsburgh & Lake Erie R.R. v. Ry. Labor Execs.’ Ass’n, 491 U.S. 490, 513, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989) (internal quotation marks omitted), “[t]his exception is necessarily a limited one,” Burlington N. R.R., 481 U.S. at 446, 107 S.Ct. 1841. In fact, “[ejven when a violation of a specific mandate of the RLA is shown,” courts should “hesitate” to grant an injunction “unless that remedy alone can effectively guard the plaintiffs right.” Id. (quoting Int’l Ass’n of Machinists, 367 U.S. at 773, 81 S.Ct. 1784) (internal quotation mark omitted).
The district court concluded that the RLA applied to this dispute, and that this meant that no provision of the NLGA could apply—thus allowing the district court to issue the preliminary injunction without considering whether Section 8 of the NLGA was satisfied. This blanket conclusion, however, elided the distinction between Sections 4 and 8 of the NLGA. Although the Supreme Court has “held that the NLGA § 4 general limitation on district courts’ power to issue injunctions in labor disputes must be accommodated to the more specific provisions of the RLA,” Pittsburgh & Lake Erie R.R., 491 U.S. at 513, 109 S.Ct. 2584 (emphasis added),[1] neither this court nor the Supreme Court has held that the same .is true with respect to Section 8.
The vast majority of courts to consider this question have applied Section 8 to disputes that the RLA governs.[2] Indeed, over the years our court has treated Sections 4 and 8 as independent limitations on *1075 a district court’s power to issue an injunction, even when the RLA applied'. See, e.g., Trans Int’l Airlines, Inc. v. Int’l Bhd. of Teamsters, 650 F.2d 949, 957-58, 961-67 (9th Cir.1980) (Kennedy, J.) (considering whether the “clean hands” requirement had been satisfied independently of analysis of whether the RLA trumped Section 4); Switchmen’s Union of N. Am. v. S. Pac. Co., 398 F.2d 443, 447 (9th Cir.1968) (considering whether Section 8 had been satisfied after determining that the RLA trumped Section 4); Order of Ry. Conductors & Brakemen v. Spokane, Portland & Seattle Ry. Co., 366 F.2d 99, 104-05 (9th Cir.1966) (noting that, even if the RLA trumped Section 4, the Supreme Court’s Toledo decision “foreclose[d] the railroad, which positively rejected mediation, from claiming an injunction”); Butte, Anaconda & Pac. Ry. Co. v. Bhd. of Locomotive Firemen & Enginemen, 268 F.2d 54, 60 & n. 10 (9th Cir.1959) (noting that Section 8 would have barred injunctive relief even if the RLA had trumped Section 4); see also Rutland Ry. Corp. v. Bhd. of Locomotive Eng’rs, 307 F.2d 21, 39-40 (2d Cir.1962) (relying in part on Butte for the proposition that, even if the RLA trumps Section 4, a party must comply with Section 8 to obtain injunctive relief).[3]
This approach to the relationship between the RLA and Section 8 is consistent with the Supreme Court’s past efforts to “accommodate” the RLA and Section 4 of the NLGA. As noted above, the RLA creates only a “limited” exception to Section 4—one restricted to situations in which an injunction is the only remedy that can safeguard a right that the RLA grants. Burlington N. R.R., 481 U.S. at 446, 107 5.Ct. 1841; see also Graham, 338 U.S. at 239-40, 70 S.Ct. 14 (rejecting a construction of Section 4 that would leave federal courts “powerless to enforce” rights granted by the RLA); Fed. Express Corp. v. Teamster Union, Local No. 85, 617 F.2d 524, 526 (9th Cir.1980) (“[Wjhile federal courts may issue injunctions in labor disputes to compel the parties to fulfill their *1076 obligations under the RLA, when no such duties exist, the Norris-LaGuardia Act controls.”). For example, in Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad, a union chose to strike rather than submit to the dispute resolution procedures of the RLA. 353 U.S. at 32-33, 77 S.Ct. 635. If the Supreme Court had chosen to strictly enforce Section 4 in those circumstances, the railroad would have effectively been left with a right under the RLA without a remedy. Accordingly, the Court instead permitted the injunction to stand despite Section 4 to prevent the specific provisions of the RLA from being rendered “nugatory.” See id. at 40-42, 77 S.Ct. 635 (quoting Virginian Ry. Co., 300 U.S. at 563, 57 S.Ct. 592). Only in such a case of “irreconcilable conflict between” the RLA and the NLGA is it necessary to choose between the RLA and the NLGA. See Chi. & N.W. Ry. Co., 402 U.S. at 582 n. 18, 91 S.Ct. 1731.
Section 8, however, does not conflict with any provision of the RLA. On the contrary, as the D.C. Circuit recognized years ago, strict enforcement of Section 8 does “not trammel, but ... rather further[s] the effectuation of that Railway Labor Act, for it ensures compliance by complainant carrier or union which cannot seek an injunction until and unless it has discharged the obligations imposed by the Railway Labor Act.” Akron & Barberton Belt R.R., 385 F.2d at 614; see also Local 553, Transp. Workers Union of Am. v. E. Air Lines, Inc., 695 F.2d 668, 679 (2d Cir.1982) (“Section 8 of the Norris-La-Guardia Act, however, does not conflict with the RLA.... Since section 8 is congruent with the RLA, Local 553 should be held to section 8’s requirements.... ”); Local 553, Transp. Workers Union of Am. v. E. Air Lines, Inc., 544 F.Supp. 1315, 1331 (E.D.N.Y.1982) (“[Section] 8 does not conflict with the mandatory status quo provisions of the RLA. Rather, [Section] 8 is in harmony with the purposes of the RLA”), modified on other grounds, 695 F.2d 668. In applying Section 8 in Brotherhood of Railroad Trainmen, Enterprise Lodge, No. 27 v. Toledo, P. & W. R.R.—a case that involved the RLA—the Supreme Court said the same: “The policy of the Railway Labor Act was to encourage use of the nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor disputes. The over-all policy of the Norris-LaGuardia Act was the same.... It is dominant and explicit in Section 8.” 321 U.S. at 58-59, 64 S.Ct. 413 (citations omitted); see also In re Dist. No. 1—Pac. Coast Dist., Marine Eng’rs Beneficial Ass’n (AFL-CIO), 723 F.2d 70, 80 (D.C.Cir.1983) (noting that Toledo held that Section 8 had not been satisfied “without even mentioning [Section] 4”). There is thus no need to read another exception into the NLGA to accommodate the RLA.[4]
*1077 Consistent with our own precedent and that of many other courts, we reaffirm that a party seeking an injunction under the RLA is not relieved of its obligation to comply with the provisions of Section 8 of the NLGA.[5]
C. Application of Section 8 to this Dispute
Section 8 provides in relevant part that “[n]o restraining order or injunctive relief shall be granted to any complainant ... who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.” 29 U.S.C. § 108. Though the precise requirements of this obligation vary from case to case, there are “certain minimum steps” that are usually required:
Unfair surprise should be avoided whenever possible. The representatives of management should meet with those of labor. Each side should listen to the contentions of the other side and each side should explain its position clearly and honestly, but not for as long a time as is customary in full-scale bargaining. In short, men of good faith must in good faith get together in a sincere effort to resolve their differences.
Rutland Ry. Corp., 307 F.2d at 41. These basic requirements are consistent with the Supreme Court’s broad construction of Section 8. See Toledo, 321 U.S. at 57, 64 S.Ct. 413 (“One must not only discharge his legal obligations. He must also go beyond them and make all reasonable effort. ...”).
Our past decisions construing Section 8 have fleshed out these principles. In Switchmen’s Union of North America, we faced a dispute over the “bumping” of a railroad yardmaster. 398 F.2d at 445-47. In dismissing the union’s argument that Section 8 divested the district court of authority to issue an injunction, we concluded that the carrier had fulfilled its obligations both because “there was no unfair surprise” in the bumping of the yardmaster and because the carrier had attempted, “in good faith,” “to confer on the issue prior to the incident which led to the strike.” Id. at 447. San Antonio Community Hospital v. Southern California District Council of Carpenters concerned a union’s decision to display a ban *1078 ner disparaging the cleanliness of the workplace. 125 F.3d 1230, 1233 (9th Cir. 1997). Considering the Section 8 issue, we held that it was sufficient that the employer “had engaged the Union on a number of occasions in an effort to resolve this dispute before seeking an injunction.” Id. at 1238.
In this ease, nothing in the record permits us to hold that ASIG satisfied Section 8’s “reasonable effort” requirement. Although the district court erred by failing to undertake a Section 8 analysis, the record reveals that ASIG sought an injunction from the district court without first attempting to settle the dispute.[6] Even if the employees lacked an identified union representative, that did not relieve ASIG of its obligations under Section 8 to make “every reasonable effort” to resolve the disagreement before seeking the injunction. We need not map out the precise contours of Section 8 here because ASIG’s failure to make any efforts to settle the dispute fell short of what Section 8 requires, and thus the district court erred by entering the injunction.[7]
The dissent responds by seeking to divert attention away from the conduct of ASIG. As far as we can tell, however, there is no authority for the dissent’s proposition that the actions of the employees may relieve the carrier from satisfying Section 8’s prerequisites. The dissent cites Switchmen’s Union of North America, Trans International Airlines, Order of Railway Conductors & Brakemen, and Butte as support for this proposition, but not one of these cases mentions the employees’ conduct as relevant to the Section 8 inquiry. In Switchmen’s Union of North America, we rejected the union’s Section 8 argument because the carrier had “performed its obligations under ... the Railway Labor Act.” 398 F.2d at 447. In Trans International Airlines, we rejected the union’s Section 8 argument because the carrier’s “own conduct” was “not sufficiently likely to be found illegal or otherwise wrongful that [it] should be prevented from seeking injunctive relief.” 650 F.2d at 957. In Order of Railway Conductors, we noted that the carrier could not “elaim[] an injunction against a strike” because the carrier had “positively rejected mediation.” 366 F.2d at 105. In Butte, we noted that the carrier was “also necessarily denied” from seeking an injunction because the carrier “had not exhausted its administrative remedies.” 268 F.2d at 60 & n. 10. Neither these cases nor the dissent can deny the Toledo rule that a carrier must establish that it made every reasonable effort before seeking an injunction. 321 U.S. at 56-57, 64 S.Ct. 413 (“If a complainant has failed ... to make every reasonable effort to settle the dispute, he is forbidden relief.” (emphasis added)). In the absence of any efforts by ASIG to comply with Section 8, the dissent’s discussion of what the employees did or did not do is simply a red herring.[8]
*1079 We emphasize that our conclusion is modest: we hold that a party must comply with Section 8 of the NLGA before seeking an injunction under the RLA. The dissent’s suggestion that our holding will disrupt commerce is fundamentally mistaken. As the Supreme Court has explained, “the purpose” of Section 8 “is to head off strikes,” not encourage them. Toledo, 321 U.S. at 65, 64 S.Ct. 413 (emphasis added). Section 8’s salutary mandate that parties make all reasonable efforts to settle labor disputes before seeking judicial intervention will help prevent, not cause, interruptions to commerce. By contrast, allowing injunctions when the necessary steps “have not been taken, not only violates the section’s terms,” but encourages parties to act unilaterally and avoid the reasonable steps that “when achieved, make unnecessary invocation of the court’s aid.” Id. This not only “defeats the purposes” of the NLGA, id., but those of the RLA as well. As noted above, the “over-all policy” of the RLA and the NLGA is the same: “to encourage use of the nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor disputes.” Id. at 58, 64 S.Ct. 413 (emphasis added). Permitting a carrier to obtain an injunction to block a strike without pursuing these nonjudicial processes—as the dissent would have it—frustrates the goals of both statutes.
IV. CONCLUSION
Our decision will neither summon monsters from the deep nor rain frogs from the heavens to “destroy” the North American transportation system. We do not hold that courts are prohibited from enjoining airport strikes. Rather, our narrow holding—compelled by Toledo and consistent with that of the vast majority of courts confronting this issue—merely requires carriers to abide by Section 8’s requirements before seeking an injunction. Because the record lacks evidence that ASIG made every reasonable effort to settle the dispute, we reverse the district court’s order and vacate the preliminary injunction.
REVERSED and VACATED.

. This is not to suggest that the RLA applies to this dispute, in which ASIG’s employees are non-unionized, or that Section 4 of the NLGA does not apply. We do not reach those intertwined questions. The dissent’s reliance on the fuelers’ obligations under Section 2, First of the RLA is thus misplaced. We assume, for the purposes of this opinion only, that this provision binds the fuelers—and that this obligation supersedes Section 4 of the NLGA.

. See Grand Trunk W. R.R. v. Bhd. of Maint. of Way Emps. Div., 497 F.3d 568, 571-73 (6th *1075 Cir.2007) (requiring that a carrier must satisfy Section 8 before obtaining an injunction under the RLA); Nw. Airlines Corp. v. Ass’n of Flight Attendants-CWA (In re Nw. Airlines Corp.), 483 F.3d 160, 166-67, 177 (2d Cir. 2007) ("While [the NLGA] generally admits of only limited exception, the Supreme Court has held that the NLGA does not preclude courts from enforcing the mandates of the RLA. Even so, however, a party seeking an injunction under the NLGA must have clean hands.” (citation omitted)); Air Line Pilots Ass’n, Int’l v. United Air Lines, Inc., 802 F.2d 886, 900-02 (7th Cir. 1986) ("In making its ruling, the district court correctly noted that any party seeking injunctive relief under the RLA must comply with section 8 of the Norris-LaGuardia Act.” (citation omitted)); Piedmont Aviation, Inc. v. Air Line Pilots Ass’n, Int’l, 416 F.2d 633, 638-39 (4th Cir.1969); Bhd. of R.R. Trainmen v. Akron & Barberton Belt R.R., 385 F.2d 581, 613-14 (D.C.Cir. 1967) ("That principle of accommodation means that actions to enjoin violations of the Railway Labor Act may be maintained without regard to Section 4 of the Norris-La Guardia Act, and yet be subject to Section 8 of that Act.”); Consol. Rail Corp. v. Bhd. of Maint. of Way Emps., 735 F.Supp. 1265, 1268-70 (E.D.Pa.1990); E. Air Lines, Inc. v. Air Line Pilots Ass’n, Int’l, 710 F.Supp. 1342, 1347 (S.D.Fla.1989). But see Bhd. of R.R. Trainmen v. Denver & Rio Grande W. R.R., 290 F.2d 266, 270 (10th Cir. 1961).
At least two other circuits have issued seemingly conflicting decisions with respect to this question. Compare Ry. Express Agency, Inc. v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, 437 F.2d 388, 393-94 (5th Cir. 1971), and Itasca Lodge 2029 v. Ry. Express Agency Inc., 391 F.2d 657, 667-69 (8th Cir.1968), with Atlanta & W. Point R.R. v. United Transp. Union, 439 F.2d 73, 79-80 (5th Cir. 1971), and Bhd. of R.R. Carmen of Am., Local No. 429 v. Chi. & N.W. Ry. Co., 354 F.2d 786, 794-96 (8th Cir. 1965).

. We also have recognized that Section 4 of the NLGA is conceptually distinct from Section 8 in other contexts. See Camping Constr. Co. v. Dist. Council of Iron Workers, 915 F.2d 1333, 1348 (9th Cir. 1990).

. The dissent relies on two Supreme Court cases interpreting Section 4 for the proposition that the "jurisdiction-stripping provisions of the Norris-LaGuardia Act do not apply to disputes, such as this one, where the parties have not first engaged in any of the procedures of the Railway Labor Act.” Dissent at 44. Again, neither of these cases speak to the proper accommodation between Section 8 and the RLA. The Court in Chicago River did not discuss the applicability of Section 8 to the case before it. And in Chicago & North Western Railway Co. v. United Transportation Union, the Court considered only the “question [of] whether § 4 of the Norris-LaGuardia Act prohibit[ed] the use of a strike injunction.” 402 U.S. 570, 581, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971) (footnote omitted); see also Brief for the Petitioner at 8 n.6, Chi. & N.W. Ry. Co., 402 U.S. 570 (No. 70-189), 1970 WL 136733 (noting that the "lower courts never reached the question [of whether Section 8 barred the injunction at issue], and it is not pertinent to the issue presented here”). We address a question left unanswered by those cases.
The dissent also fails to engage with any of the cases cited above that give Section 8 a much wider scope, instead claiming that our *1077 position "creates a circuit split.” Dissent at 35. Yet three of the cases cited by the dissent never mention Section 8. This could perhaps mean that these courts assumed without comment that the RLA trumped Section 8—but it could just as easily mean that, like the Fifth Circuit, these courts did not consider whether "[Section] 8 of the Norris-LaGuardia Act” applied because it "was not advanced as a basis for denying an injunction against the strike,” Nat'l Airlines, Inc. v. Int’l Ass’n of Machinists & Aerospace Workers, 416 F.2d 998, 1003 n. 4 (5th Cir.1969) (citing Butte's discussion of Section 8 but recognizing that "[w]e take the case as we find it”). Moreover, the lone case in this purported "split” that does discuss Section 8 actually cuts against the dissent’s position. In United Air Lines—immediately following the sentence quoted by the dissent—the court reaffirmed the Seventh Circuit’s longstanding position that the RLA does not categorically supersede Section 8, noting that things would have been different if the union had a “stronger case for barring the injunction under [Section] 8 of the NLGA.” 243 F.3d at 365 & n. 11. But even if we were to read these four cases as the dissent suggests, they merely add to the circuit split, and possible intra-circuit splits, noted above.

. Section 8 also prohibits an injunction if the complainant “has failed to comply with any obligation imposed by law which is involved in the labor dispute in question.” Though Defendants do not invoke this provision here, the dissent does not explain why—in a different case involving the RLA—Congress would have intended to allow carriers or employees to escape the obligation to follow the law before seeking injunctive relief.

. The dissent chides us because there is “no district court finding of fact to that effect,” dissent at 56, but ASIG's explicit "position is that it had no obligation to negotiate unless and until a representative was certified.” ASIG has never contended—as the dissent does now—-that its single meeting with Popes-cu satisfied Section 8’s requirements.

. Like the dissent, ASIG argues that even if it did not comply with Section 8 “the balancing of hardships and the public interest weigh in favor of issuing the injunction.” See United Air Lines, Inc. v. Int’l Ass'n of Machinist & Aerospace Workers, 243 F.3d 349, 365 n. 11 (7th Cir.2001). This court, however, has never recognized a public interest exception .to the plain language of Section 8, and we decline to do so here.

.We do not hold, as the dissent suggests, that injunctions are never available in RLA labor disputes. If a party seeking an injunction has exercised “every reasonable effort” to resolve the disagreement, Section 8 will not serve as a bar. What constitutes "every reasonable effort” will vary from case to case, and will depend in part on the actions (or inactions) of *1079 the opposing side. See Rutland Ry. Co., 307 F.2d at 40-41. The dissent is thus wrong to suggest that we hold that employers are barred from obtaining injunctions even if the employees refuse to negotiate or even if the employees are too fractured to engage in any meaningful negotiation. We hold only that employers must exercise "every reasonable effort” before seeking an injunction; no "reasonable” effort, which is what we face here, cannot be "every reasonable effort.” As noted supra, not even ASIG claims its efforts were reasonable.