United States Court of Appeals

For the Eighth Circuit

_____

No. 21-2608
_____

International Association of Sheet Metal, Air, Rail, and Transportation Workers;
Smart- TD General Committee of Adjustment GO-433

*Plaintiffs - Appellants*

v.

Iowa Northern Railway Company

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Northern District of Iowa - Eastern
_____

Submitted: January 12, 2022
Filed: June 24, 2022
_____

Before LOKEN, GRUENDER, and GRASZ, Circuit Judges.
_____

LOKEN, Circuit Judge.

Iowa Northern Railway Company ("Iowa Northern") and the International Association of Sheet Metal, Air, Rail and Transportation Workers (the "Union") are parties to a Collective Bargaining Agreement ("CBA") that is subject to the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* In August 2019, Iowa Northern offered to raise pay for its unionized Train and Engine employees to $300 per day because

Iowa Northern was having trouble attracting and retaining these employees at the $271 daily rate the CBA then provided. The Union[1] tentatively agreed and submitted this proposal to its members, but they voted it down in October.

On April 1, 2020, the 2015 CBA's moratorium on proposing changes expired, and the Union served a "Section 6 notice" on Iowa Northern. Under the RLA, "major disputes" are those in which a party seeks to create or amend contractual rights. See Consol. Rail Corp. v. Ry. Labor Executives' Ass'n, 491 U.S. 299, 302 (1989). A party seeking to negotiate CBA amendments commences a major dispute by serving a Section 6 notice. See 45 U.S.C. § 156. "The effect of § 6 is to prolong agreements subject to its provisions regardless of what they say as to termination." Manning v. Am. Airlines, Inc., 329 F.2d 32, 34 (2d Cir.), cert. denied, 379 U.S. 817 (1964).

On May 4, 2021, Iowa Northern served a Section 6 notice on the Union, proposing changes to the CBA, including amending the CBA's rates-of-pay provision. When the Union failed to respond within the time periods prescribed in Section 6,[2] Iowa Northern gave notice it would resort to self-help. It increased the

---

[1]In this opinion, "Union" includes SMART-TD General Committee of Adjustment GO-433, which negotiates CBA terms and handles claims and grievances.

[2]Section 6 provides:

> Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice.

daily pay rate to $300 and ceased deducting union dues from member pay checks effective June 16.

The Union filed this action on June 30, contending that Iowa Northern violated the RLA by unlawfully resorting to self-help. It promptly moved for a preliminary injunction ordering Iowa Northern "to return to the status quo that existed prior to June 14, 2021, including the negotiated rate of pay and deduction of dues." The district court[3] denied preliminary injunctive relief, concluding the Union did not meet its burden of establishing likelihood of success on the merits. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers - Transp. Div. v. Iowa N. Ry. Co., No. C21-2038-LTS, 2021 WL 3038874, at *5 (N.D. Iowa July 19, 2021) (the "Order"). The Union appeals the interlocutory Order. See 28 U.S.C. § 1292(a)(1). "Denial of injunctive relief will not be reversed on review unless the trial court clearly erred in its characterization of the facts, made a mistake of law, or abused its discretion in considering the equities." Sheet Metal Workers' Int'l Ass'n v. Burlington N. R.R., 893 F.2d 199, 201 (8th Cir. 1990) (quotations omitted). Applying this deferential standard of review, we affirm.

## I. The Governing Legal Landscape

Reflecting the importance of transportation to the nation's economic prosperity and security, the RLA imposes a judicially enforceable legal obligation on railroads and employee unions to bargain in good faith. 45 U.S.C. § 152, First; Chicago & N.W. Ry. v. United Transp. Union, 402 U.S. 570, 576-79 (1971). For major disputes, Sections 5 to 10 of the RLA, 45 U.S.C. §§ 155-60, require the parties to undertake an "almost interminable process":

---

[3]The Honorable Leonard T. Strand, Chief Judge of the United States District Court for the Northern District of Iowa.

> If direct negotiation fails . . . either party may invoke the services of the National Mediation Board (NMB). If mediation fails, the NMB must attempt to persuade the parties to submit the controversy to arbitration, which is binding only if both parties consent. If the parties fail to submit to arbitration, the President may create an Emergency Board to help resolve the dispute. During this entire process, neither party may unilaterally alter the status quo.

Sheet Metal Workers', 893 F.2d at 202 (cleaned up). The status quo provision at issue in this case is Section 2, Seventh, which provides that no carrier "shall change the rates of pay, rules, or working conditions of its employees" except as prescribed in a CBA or in Section 6. 45 U.S.C. § 152, Seventh. "Implicit in the statutory scheme, however, is the ultimate right of the disputants to resort to self-help -- the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration." Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 379 (1969) (quotation omitted); see Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 724-25 (1945).

In this appeal, the Union seeks a preliminary injunction compelling Iowa Northern to reverse an action it took during the parties' labor dispute. The requested relief implicates another fundamental federal labor law statute, the Norris-LaGuardia Act, which broadly provides that "No court of the United States . . . shall have jurisdiction to issue any . . . temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter . . . ." 29 U.S.C. § 101. Section 104 of the Norris-LaGuardia Act enumerates specific acts that may not be enjoined.

In a series of decisions, the Supreme Court addressed the seeming inconsistency between judicially enforcing the RLA's mandatory major dispute procedures and adhering to the Norris-LaGuardia Act's anti-injunction mandate. The Court concluded that a district court "has jurisdiction and power to issue necessary

injunctive orders to enforce compliance with the requirements of the RLA notwithstanding the provisions of the Norris-LaGuardia Act." Pittsburgh & Lake Erie R.R. v. Ry. Labor Executives' Ass'n, 491 U.S. 490, 513 (1989) (quotations omitted). "The specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act." Id. (quotation omitted).

Maintaining the status quo during major disputes is "central to [the RLA's] design." Detroit & Toledo Shore Line R.R. v. Transp. Union, 396 U.S. 142, 150 (1969). Thus, a district court's equitable jurisdiction includes the power to enjoin a failure to maintain the status quo before these mandatory dispute resolution procedures have been completed. Id. at 150-54. "However, the policy of the [Norris-LaGuardia] Act suggests that the courts should hesitate to fix upon the injunctive remedy for breaches of duty owing under the labor laws unless that remedy alone can effectively guard the plaintiff's right." Int'l Ass'n of Machinists v. Street, 367 U.S. 740, 773 (1961).

Section 8 of the Norris-LaGuardia Act contains an additional prohibition that is relevant to this appeal:

> No . . . injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, *or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.*

29 U.S.C. § 108 (emphasis added).[4] This provision has a companion in Section 2, First of the RLA, which requires that carriers and employees "exert every reasonable

---

[4]In the Norris-LaGuardia Act's legislative history, § 8 is characterized as "the 'clean hands' provision." Brotherhood of R.R. Trainmen, Enter. Lodge, No. 27 v. Toledo, Peoria & W. R.R., 321 U.S. 50, 60 (1944).

effort to make and maintain agreements . . . and to settle all disputes . . . to avoid any interruption of commerce or to the operation of any carrier." In holding that the Norris-LaGuardia Act did not bar a court of equity from compelling compliance with a railroad's Section 2 duty to bargain, the Supreme Court observed that "whether action taken or omitted is in good faith or reasonable, are everyday subjects of inquiry by courts in framing or enforcing their decrees." Virginian Ry. Co. v. Sys. Fed'n No. 40, 300 U.S. 515, 550 (1937). Three decades later, in Chicago & N.W. Ry., the Court noted the language of Section 8 -- "failed to make every reasonable effort" -- and stated it had "no reason to believe that the district courts are less capable of making the [equitable] inquiry in the one situation than in the other." 402 U.S. at 579.

Though we have not addressed the issue, given this Supreme Court guidance it is not surprising that "[t]he vast majority of courts to consider this question have applied Section 8 to disputes that the RLA governs." Aircraft Serv. Int'l, Inc. v. Int'l Brotherhood of Teamsters, 779 F.3d 1069, 1074 & n.2 (9th Cir. 2015) (en banc). The Ninth Circuit treats Section 8 as an independent issue in cases where the RLA "trumps" Section 4, holding "that a party must comply with Section 8 of the [Norris-LaGuardia Act] before seeking an injunction under the RLA." Id. at 1075, 1079. We agree. Therefore, a party seeking a preliminary injunction to enforce the RLA's duty to maintain the status quo during a major dispute must satisfy Section 8's "every reasonable effort to settle" requirement to establish jurisdiction under the Norris-LaGuardia Act, and then must establish that our customary Dataphase standards[5] warrant a preliminary injunction. See Great Lakes Aviation, Ltd. v. Int'l Ass'n of Machinists, Civ. No. 07-4314, 2007 WL 3244077, at *4-6 (D. Minn. Nov. 1, 2007) (denying a preliminary injunction to maintain the Section 6 status quo, applying "the Dataphase and Norris-LaGuardia Act factors").

---

[5]Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

## II. Factual and Procedural Background

The Union filed its Section 6 notice on April 1, 2020, but the parties did not meet for an initial Section 6 conference until January 15, 2021. The Union's representative was Arden Crawford, the General Chairperson of GCA GO-433. He stated that instead of starting negotiations from scratch, the Union wished to revisit the agreement that Union members voted down in October 2019.

The parties met again on March 24-25, 2021. According to Declarations regarding these meetings submitted by Crawford and by William Magee, Iowa Northern's General Manager, Crawford advised Iowa Northern that its 2019 offer "may be acceptable . . . if a few modifications were made" and "went through some of [the Union's] proposed modifications." After the Iowa Northern negotiators conferred, Magee responded that "several [of the Union's additional items] would be unacceptable" to Iowa Northern. Crawford declared that Iowa Northern said the Union needed to "start from scratch." Magee declared:

> After a long silence, five plus minutes, Mr. Crawford made the comment that there was nothing further to talk about and the Union representatives prepared to leave. Mr. Hicks [Iowa Northern's labor consultant] asked Mr. Crawford if he wanted to schedule a follow up conference and he said "no."

Crawford declared, "There was no discussion between the parties about terminating the [Section 6] conferences, nor was it my or the Union's intent to terminate conferences at the time."

On May 3, 2021, Iowa Northern emailed the Union, suggesting the parties continue negotiating the Union's Section 6 notice on June 3 and addressing other matters. The Union's response addressed only the other matters. Iowa Northern then served its Section 6 notice on May 4, proposing changes to the CBA including as an

amended rates-of-pay provision, "Daily rates of pay and any increases will be at the carrier's discretion." Receiving no response to its Section 6 notice, Iowa Northern advised the Union on June 5 that it was implementing its proposed changes "affecting the rates of pay, rules, and working conditions." On June 16, 2021, Iowa Northern increased the daily rate of pay to $300. The Union submitted a mediation request to the NMB on June 17, more than 10 days after Iowa Northern advised it would resort to self-help. Mediation between the parties commenced and is ongoing.

## III. Analysis

In denying the Union's motion for a preliminary injunction, the district court explained that the Union's "likelihood of succeeding on the merits depends primarily on (1) whether negotiation conferences on [the Union's] Section 6 notice were terminated and, even if they were not, (2) whether [the Union's] failure to timely respond to Iowa Northern's Section 6 notice allowed Iowa Northern to resort to self-help." Order at *4. The district court concluded that disputed facts precluded it from determining whether the Union terminated negotiations on its Section 6 notice. If the Union did not terminate negotiations on its Section 6 notice, its likelihood of success on the merits turned on whether its failure to timely respond to Iowa Northern's Section 6 notice allowed the railroad to engage in self-help. Finding no case law guidance on that issue, the court concluded the Union failed "to establish with any clarity that Iowa Northern was not entitled to engage in self-help" and denied the extraordinary relief of a preliminary injunction. Id. at *5.

On appeal, citing no cases directly supporting its position, the Union argues (1) Iowa Northern's purported Section 6 notice was merely a counterproposal to the Union's still-ongoing April 2020 notice and therefore did not require a Section 6 response; (2) the district court erred in concluding that Section 6 required the Union to agree to meet within ten days of Iowa Northern's Section 6 notice, and that the Union's failure to respond allowed Iowa Northern to engage in self-help; and (3) the

-8-

court clearly erred in finding a factual dispute whether the Union terminated conferences on its Section 6 notice, which was a prerequisite to lawful self-help.

(1) The Validity of Iowa Northern's Section 6 Notice. The Union argues Iowa Northern's purported Section 6 notice was merely a counterproposal to the Union's still-ongoing April 2020 notice and therefore did not require a Section 6 response. The district court rejected this contention:

> The plain language of the RLA does not support this argument. Nothing in [45 U.S.C.] § 156 limits the number of Section 6 notices that may be filed by either party. . . . Indeed, whenever a notice of intended changes is given, § 156 requires the parties to agree on a time and place to meet within 10 days. 45 U.S.C. § 156. While the RLA demands that both parties exert every reasonable effort to meet this requirement, [the Union] -- as the recipient[] of [the Railroad's] notice -- had a duty to respond to the notice in some way.

Order at *4. We agree.

Other courts have addressed competing or overlapping Section 6 notices without questioning their validity. In Wheeling & Lake Erie Railway v. Brotherhood of Locomotive Engineers and Trainmen, for example, the Union served a Section 6 notice in January; the railroad served its own Section 6 notice in March and then implemented the changes it sought. Without criticizing the multiple Section 6 notices, the Sixth Circuit held that the railroad was obligated to maintain the status quo "until the parties concluded *the RLA's major dispute process*." 789 F.3d 681, 686, 697 (6th Cir. 2015) (emphasis added). The duty under Section 2, First of the RLA and Section 8 of the Norris-LaGuardia Act to make "every reasonable effort" to settle disputes supports interpreting Section 6 as permitting both parties to serve Section 6 notices proposing different changes. The Union cites no contrary authority.

Section 156 applies to any "written notice of an intended change in agreements affecting rates of pay, rules, or working conditions," which would include a notice that is a counterproposal. Reduced to parading horribles, the Union argues that multiple ongoing Section 6 notices will lead to "absurd" results because repeated notices would require the parties to agree upon a time and place to meet within ten days after every notice. But the RLA's judicially enforceable duty to bargain in good faith, 45 U.S.C. § 152, First, and the fact that these Section 6 requirements "are not inflexible deadlines incapable of modification, by express agreement," Railway Labor Executives Association v. Boston & Maine Corp., 664 F. Supp. 605, 611 (D. Me. 1987), refute this dire prediction. Here, for example, the parties agreed to waive the 30-day period in which to conduct their initial conference and did not initially confer for more than nine months after the Union served its Section 6 notice.

The RLA's major dispute procedures are designed "to provide for the prompt and orderly settlement of all disputes." 45 U.S.C. § 151a. Bargaining cannot occur if one party fails to engage with the other. Therefore, the district court did not err in concluding the Union's failure to respond to Iowa Northern's Section 6 notice significantly reduced its showing of a likelihood of success on the merits.

(2) The Ten Day Issue. The Union's position on this issue distorts the statute and ignores the facts of this case. Section 6 provides that "the time and place for the beginning of conference . . . shall be agreed upon within ten days after the receipt of [the Section 6] notice, and said time shall be within the thirty days provided in the notice." The district court ruled: "While the RLA demands that both parties exert every reasonable effort to meet this requirement, [the Union] -- as the recipients of Iowa Northern's notice -- had a duty to respond to the notice in some way." Order at *4, citing Ry. Labor Executives' Ass'n, 664 F. Supp. at 611. The Union's failure to respond to Iowa Northern's Section 6 notice was certainly relevant to whether it satisfied its duty under Section 8 of the Norris-LaGuardia Act to make "every reasonable effort to settle" the dispute, a prerequisite to seeking injunctive relief.

-10-

When the Union did not respond, Iowa Northern did not resort to self-help ten days after its Section 6 notice. It waited until the thirty day mandate in Section 6 expired, then gave the Union ten days notice it would resort to self-help unless the Union requested the services of the NMB, and resorted to self-help when the Union failed to timely request NMB services. Thus, Iowa Northern satisfied its statutory obligation to give the Union "at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions," and ten days notice after terminating conferences on its Section 6 notice, before implementing its proposed changes when the Union did not timely request NMB's services. See 45 U.S.C. §§ 152, Seventh; 156. Again, the Union cites no contrary authority.

Alternatively, the Union argues it timely invoked the NMB's mediation services "on June 15, 2021, as corrected on June 17, 2021." But the Union's June 15 letter was addressed to Iowa Northern and only suggests the Union intended to invoke the services of the NMB. This letter did not comply with the NMB's regulations, which specify that a request must be made on a specific form, in duplicate, and signed by the "highest officer of the carrier" or by the "chief executive of the labor organization." 29 C.F.R. § 1203.1. Mere expression of intent to mediate is insufficient to invoke mediation under 45 U.S.C. § 156. Bd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps. v. Phila., Bethlehem & N.E.R.R., 633 F. Supp. 371, 373 (E.D. Pa. 1986). In effect, the Union argues that untimely invocation of the NMB's services can satisfy Section 6. This would "frustrate the obvious purpose of the limited status quo provisions of Sections 5 and 6, the preservation of the ultimate right of the parties . . . to resort to economic self-help." Iberia Air Lines of Spain v. Nat'l Med. Bd., 472 F. Supp. 104, 107-09 (S.D.N.Y. 1979), aff'd, 636 F.2d 1201 (2d Cir. 1980), and aff'd sub nom., United States v. Iberia Air Lines of Spain, 636 F.2d 1205 (2d Cir. 1980).

(3) Whether the Union's Section 6 Notice Was Terminated. The Union argues the district court erred in finding a factual dispute regarding whether the Union

terminated conferences on its April 2020 Section 6 notice because there is "nothing in the record that supports a finding that the Union clearly and unequivocally communicated that it was terminating conferences in March 2021, or at any time." We reject this contention.

First, the parties and the district court wrongly assumed that Section 6 conferences may only be terminated by a "clear and unequivocal" declaration to that effect. This is not Eighth Circuit law. The term "clear and unequivocal" originates in a district court opinion that cited no supporting authority. United Transp. Union v. Del. & Hudson Ry., 977 F. Supp. 570, 575 (N.D.N.Y. 1997). It was cited *but not adopted* by the District of Minnesota in Great Lakes Aviation, 2007 WL 3244077, at *5. And it was cited without analysis in a non-controlling bankruptcy court opinion in which the court *held* only that "the mere passage of . . . time did not terminate the informal process of Section 6 negotiations." In re Mesaba Aviation, Inc., 350 B.R. 112, 131 (Bankr. D. Minn. 2006), appeals dism'd, Nos. CIV.06-4320, 06-4499 (MJD), 2007 WL 978086 (D. Minn. Mar. 28, 2007). We agree with the holding in Mesaba Aviation but we reject the Union's contention that Section 6 conferences may only be terminated by a single, clear and unequivocal declaration. Rather, the merits of this issue -- whether the Union's Section 6 notice was terminated before Iowa Northern resorted to self-help -- requires analysis of all attempts to negotiate the Union's notice.

The district court found a material fact dispute concerning what occurred at the end of the March 2021 meetings that precluded the Union's claim of likelihood of success on the merits of this claim. We agree. In addition, the Union's claim turns not just on what the union representatives said or did not say at those meetings. Not only did the Union representatives walk out of those meetings, they did not schedule another conference thereafter, did not respond to Iowa Northern's request for a conference on May 3, and did not respond to Iowa Northern's May 4 Section 6 notice.

The district court did not err in concluding that the material factual dispute weighs against granting a preliminary injunction based on this claim.

(4) The Norris-LaGuardia Act Factor.  On appeal, as in the district court, the Union totally fails to address whether it failed to comply with the duty imposed by Section 8 of the Norris-LaGuardia Act and therefore the district court lacked jurisdiction to issue the status quo injunctive relief being sought.[6]  A review of the relevant facts reveals this is a significant issue.

Iowa Northern promptly responded to the Union's April 2020 Section 6 notice. An initial conference was not held until January 2021 because of changes in the Union's General Chairperson and the Union's refusal to attend in-person conferences, delays that did not prompt Iowa Northern to request NMB mediation services.  At the second conference in March, the Union representatives walked out, leaving Iowa Northern the impression there would be *no* further conferences, an impression reinforced when the Union did not respond to Iowa Northern's May 3 email proposing continued negotiations in early June.  As the Union obviously knew, this persistent refusal to negotiate frustrated Iowa Northern's need to increase its uncompetitive rates of pay.  Thus, Iowa Northern had good reason to issue its own Section 6 notice on May 4, 2021, putting the rate-of-pay issue squarely in play.

On June 5, 2021, the Union having not responded to Iowa Northern's Section 6 notice within ten days and the thirty-day time period prescribed in Section 6 for the initial conference having expired, Iowa Northern advised that it would resort to self-help by implementing the changes it had noticed.  On June 16, Iowa Northern raised the daily rate of pay to $300.  Rather than meet its Section 8 obligation to "make every reasonable effort to settle [the pay rate] dispute" by requesting NMB mediation

---

[6]Section 8 of the Norris-LaGuardia Act does not implicate the district court's original jurisdiction over this case.  Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers, 390 U.S. 557, 560-61 (1968).

services within ten days, the Union delayed requesting NMB services until June 17. This prolonged foot-dragging and refusal to respond on an issue of vital importance to Iowa Northern (and to the Union's members) raise substantial doubt that the Union's status quo claim will survive Section 8 of the Norris-LaGuardia Act review.

For all these reasons, we conclude the district court did not err or abuse its discretion in denying the Union's motion for a preliminary injunction. "A district court has broad discretion in ruling on requests for preliminary injunctions; we will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion." Kroupa v. Nielsen, 731 F.3d 813, 818 (8th Cir. 2013) (quotations omitted).

## IV. Conclusion

The irony in this case is that the Union seeks a status quo injunction that will deprive its members of a pay raise until the completion of bargaining negotiations the Union has purposely prolonged. The dispute is now in mediation before the NMB. It will hopefully be resolved with dispatch. In the meantime, Iowa Northern gets to implement a competitively needed pay raise which puts additional well-earned dollars in the pockets of its Train and Engine employees. As the Fifth Circuit recently stated in applying RLA and Norris-LaGuardia Act standards and vacating a purported status quo injunction, "the Supreme Court has admonished that a court should avoid 'free-wheeling judicial interference in labor relations,' and should issue an injunction only where it is 'the only practical, effective means of enforcing the command of § 2 First.' . . . Issuing an injunction . . . is not the only way [to force a party to bargain]." BNSF Ry. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers - Transp. Div., 973 F.3d 326, 340 (5th Cir. 2020); cf. Enterprise Lodge, No. 27, 321 U.S. at 63-65. We conclude the district court's decision to exercise equitable restraint was appropriate in this case.

-14-

The district court's Order dated July 19, 2021 is affirmed.

_____